8989

HERNDON v. WARDLAW, RECEIVER.

*IN RE* STEVENS v. YORK COTTON MILLS.

(84 S. E. 112.)

CONTRACTS. EVIDENCE. CORPORATIONS. AUTHORITY OF AGENTS. ESTOPPEL.

1. EVIDENCE—PAROL EVIDENCE—WRITTEN CONTRACT—CONSTRUCTION.—Where the president of a corporation signed a memorandum addressed to claimant, agreeing to take $6,000 from claimant and to issue to him preferred stock bearing interest at 7 per cent., it being understood that after one year, if so desired by claimant, and after due notice, the corporation would reimburse him for the amount or continue the transaction on the same terms, to wit, to pay claimant an additional 1 per cent. per annum on the amount, which should begin on the issue of the stock, etc., the contract was ambiguous as to whether it was intended to evidence a sale of stock or a loan of money; and hence parol evidence showing the surrounding circumstances was admissible to enable the Court to ascertain

1—100

the intention of the parties and was not within the parol evidence rule.

2. CONTRACTS — CONTEMPORANEOUS CONSTRUCTION. — Where a written contract is ambiguous, the practical construction which the parties themselves have given to it, as indicated by their acts, may be shown as reflecting their intention.

3. CORPORATIONS—CREDITORS.—Where the authority of the officer of a corporation to borrow money and bind the corporation for its payment is unquestioned, the authority of such officer to pledge the stock of the corporation or make a contract for its redemption need not be considered in determining whether or not one to whom certificates of stock were issued, on which money was obtained from him for the use of the corporation was a creditor thereof

4. CORPORATIONS—CONTRACTS—SALE OF STOCK—LOAN.—A memorandum, signed by the president of a corporation and addressed to claimant, recited that the corporation would take $6,000 from claimant and issue preferred stock therefor at 7 per cent., payable semiannually, it being understood that after one year, if claimant desired, and after due notice, the corporation would reimburse him for the amount or continue the transaction on the same terms, to wit, paying claimant an additional 1 per cent. per annum on the amount from the issuance of the stock. At the expiration of the year claimant gave notice of his election to terminate the contract and require payment of the amount on surrender of the certificates, but time therefor was extended, and at the expiration of another year the corporation's president wrote claimant that the money would be paid in installments of $2,000 each at specified dates. *Held*, that such facts created claimant a creditor of the corporation and not a stockholder.

5. CORPORATIONS — STOCKHOLDERS — "INTEREST." — The word "interest," where used in a contract to pay money to a corporation, the payer receiving preferred stock, is not equivalent to the word "dividends," and sustains the view that the parties intended a loan and not a sale of stock.

6. CORPORATIONS— MEMBERSHIP— PAROL EVIDENCE— NATURE OF CONTRACT.—A contract which on its face may evidence a sale of corporate stock may be shown by parol to have been merely for a loan of money.

7. CORPORATIONS— CONTRACTS— EXECUTION— SIGNATURE OF OFFICER.— Where a written contract showed on its face that it was made for a corporation, and that W., its president, had authority to act for the corporation, the fact that he signed the contract "W., President," or "Pt.," did not indicate that the abbreviation was mere *descriptio personae* and that the contract was his own and not that of the corporation.

8. CONTRACTS—FORM—PARTIES—ESTOPPEL.—Where a written contract shows upon its face that it was made on behalf of a corporation,

and it appears from evidence, *aliunde*, that the officer making it had authority to act for the corporation, that he did so act, and that the corporation received the benefits of the contract, the corporation is estopped to deny its obligation under the contract on the ground that the contract is executed in the individual name of such officer.

Before DEVORE, J., Yorkville, February, 1914. Affirmed.

Claim by R. J. Herndon, as a creditor to share in the distribution of the assets of the York Cotton Mills, an insolvent corporation. From an order allowing such claim, the receiver of the insolvent corporation appeals, and assigns the following errors:

I. Error on part of the trial Judge in failing to exclude from the evidence:

(a) A letter of April 4, 1910, Exhibit "A."

(b) The oral testimony of Herndon and Wardlaw as to transactions leading up to the execution of the contract, Exhibit "B."

(c) The testimony of Herndon and Wardlaw as to what they considered the contract evidenced by Exhibit "B."

Exceptions 1, 4, 5, 6 and 7.

II. Error on part of trial Judge in holding:

(a) Contract, Exhibit "B," was contract of York Cotton Mills.

Error in not holding:

(a) That contract was personal contract between Herndon and Wardlaw.

(b) That it was beyond the scope of Wardlaw's authority to bind the mill by such contract.

(c) That Wardlaw's want of authority was known to Herndon when contract was made.

FOOTNOTE.—See notes on admissibility of parol evidence to explain latent ambiguities in terms of contract in 3 L. R. A. 805 and 6 L. R. A. 42.

Exceptions 2, 3 and 8.

III. Error in not holding:

(a) That the contract as evidenced by Exhibit "B" was a contract to retire the stock held by Herndon.

(b) That even if the parties thereto attempted to make a contract between Herndon on the one hand and York Cotton Mills on the other, said contract was of no force and effect as against York Cotton Mills, in that

(1) It was contrary to the express provisions of the statute law of South Carolina.

(2) It was contrary to the provisions and resolutions under which the stock was issued.

(3) It was so known to Herndon before and at time contract was made.

Exception 9.

IV. Error in not holding:

That even if the contract in question is enforcible against York Cotton Mills, Herndon could not be paid under it until the creditors of the mill are paid in full.

Exceptions 10 and 12.

V. Error in finding:

(a) That the contract in controversy was a loan to York Cotton Mills.

(b) That the consideration therefor was the surrender to the mills of $6,000 of mortgage bonds of the mill.

Exception 11.

The facts are stated in the opinion.

*Mr. W. W. Lewis,* for appellant, submits: *Parol evidence incompetent:* 90 S. C. 454. *Construction placed on contract of parties:* 89 S. C. 79. *Form of contract:* 52 S. C. 152. *Burden of showing authority of agent:* 10 Cyc. 1148. *Statutory authority:* Civil Code, 1912, secs. 2796 and 2804. *Issue of stock:* Civil Code, 1912, 2795, 2796, 2804. *Company could not purchase its own stock:* 33 Am. Rep. 343; 103 S. W. 975; 19 Kan. 60; 35 Ohio 258; 88 Tenn. 476; 24

Mo. App. 338; 3 Barb. Ch. 207. *Secret agreements to retire stock enforcible:* 10 Cyc. 545, 3 (a), (b), (c). *Plea of ultra vires:* 87 S. C. 448; 10 Cyc. 1162 (c). *Creditors to be paid before holder of preferred stock:* 10 A. & E. Ann. Cas. 143. *Repurchase of stock not allowed to prejudice of creditors:* 33 Am. St. Rep. 338; 85 Am. St. Rep. 67; 52 Am. St. Rep. 560; 80 Ill. 446; 59 Am. St. Rep. 751. *Acceptance of stock estops holder from claiming to be creditor:* 48 S. C. 278. *Stockholder's liabilities went with stock:* Ann. Cas. 1913c, 415; 10 A. & E. Ann. Cas. 143, 144. *Fraud on creditors:* 10 Cyc. 440; 103 S. W. 975; 22 Am. Rep. 199. *Contracts to repurchase stock illegal:* 103 S. W. 975.

*Mr. J. S. Brice,* for respondent, submits: *Exhibits A, B and C are only evidences of debt:* 18 S. C. 484; 19 S. C. 257; 42 S. C. 170; 54 S. C. 598; 57 S. C. 60. *Exhibit B equivocal:* 21 A. & E. Enc. 1108, 1109, 1111, 1112. *Estoppel to plead ultra vires:* 10 Cyc. 1158 and 1159; 60 Am. St. Rep. 172; 54 S. C. 595.

*Mr. C. E. Spencer,* also for respondent, cites: *Testimony to show transaction a loan competent:* 3 Pom. Eq. Juris., secs. 1193-1196; 1 Jones Mtges. 263-265, 273. Cook on Corporations, sec. 465; 9 Rich. Eq. 339; 1 Strob. Eq. 325; 41 S. C. 153; 31 S. C. 281. *Testimony competent to clear up ambiguity in contract:* 89 S. C. 81. *Receiver may not plead ultra vires:* 89 S. C. 445; 52 S. C. 152. *Power to borrow money and pledge assets:* 10 Cyc. 1101. *Solvent corporation may purchase its own stock:* 33 Am. St. Rep. 338; 80 Ill. 446; Cook Corporations, sec. 247. *Because claimant is a creditor he should not be postponed till other creditors are paid:* 3 Pom. Eq. Juris., secs. 1193-1196; Jones Mtges. 263-265, 273; Cook Corporations, sec. 465, 247; 49 Fed. 496; 89 S. C. 81. *Construction placed by parties on contract:* 9 Cyc. 588, 589; 2 Paige Contracts, sec. 1129; 54 S. C. 582; 87 S. C. 445.

January 18, 1915.

The opinion of the Court was delivered by MR. JUSTICE HYDRICK.

On April 4, 1910, the respondent, Herndon, and York Cotton Mills, by its president, J. G. Wardlaw, made the following contract:

*(Exhibit "A.")*

"Yorkville, S. C., April 4, 1910.

R. J. Herndon, Esq., Yorkville, S. C.:

We agree to take $6,000 from you, say, on April 25th, May 27th and June 24th, 1910, to issue you preferred stock bearing interest at 7 per cent., payable semiannually. It being understood that after the expiration of one year, if so desired by you, and after due notice, that we will reimburse you for the amount or continue the transaction upon the same terms as at present, viz.: to pay you an additional 1 per cent. per annum on the $6,000, which shall begin upon the issue of the stock.

I agree to the above. J. G. Wardlaw, President; R. J. Herndon."

At that time the corporation had no preferred stock; but, on April 21, 1910, the stockholders met, and, by resolution duly adopted, increased the capital stock from $150,000 to $300,000. It was provided that the increase or new stock should be preferred stock, the preference consisting chiefly in its being given priority over the old or common stock as to assets, in case of final liquidation, and as to cumulative dividends out of the net earnings to the extent of seven per cent. per annum, payable in January and July of each year, and no mortgage was to be placed on the property during the life of the preferred stock. It appears that a mortgage was then outstanding to secure certain bonds. The proceeds of the sales of the preferred stock were to be used to retire these outstanding bonds and to purchase new machinery, and the right was reserved to retire the preferred stock on July 1, 1915, at par, together with any unpaid dividends.

Herndon was a stockholder and also a creditor of the mils, and knew of the terms and conditions above stated upon which the preferred stock was to be issued. He advanced money to the mills according to the agreement of April 4th, and, on June 1st, 1910, the following agreement was executed:

*(Exhibit "B.")*

"Memorandum of agreement made this 1st day of June, 1910, between R. J. Herndon and J. G. Wardlaw, president of York Cotton Mills, all of county and State aforesaid. witnesseth:

R. J. Herndon has bought sixty shares of the preferred stock of York Cotton Mills, paying therefor $6,000 in cash, and has been issued three certificates of stock, each for $2,000, and dated July 1, 1910.

The York Cotton Mills agrees to pay the said R. J. Herndon 8 per cent. interest on the said $6,000 from July 1, 1910, payable semiannually, that is, 1 per cent. in addition to the 7 per cent. dividend named in certificate.

On July 1, 1911, after thirty days' notice, this contract may be terminated by either party, the $6,000 being paid to the said R. J. Herndon upon surrender of the certificates of stock, or by mutual consent it may be continued at pleasure upon the same terms as hereinbefore mentioned.

In witness whereof we have set our hands and seals this 1st day of June, 1910. R. J. Herndon (L. S.), J. G. Wardlaw, President (L. S.), York Cotton Mills."

On July 1, 1910, in accordance with these agreements, 60 shares of preferred stock, of the par value of $100 each, were issued to Herndon, evidenced by three certificates of 20 shares each. These certificates were in the usual form of certificates of preferred stock, with the rights, terms and conditions, specified in the resolution above mentioned, endorsed thereon. There was nothing on them or on the books of the corporation to show that they were held by Herndon otherwise than as any other holder of preferred

stock. At the same time, Herndon converted another obligation which he held against the corporation for $2,500 into preferred stock, and received therefor a certificate similar in all respects to those first above mentioned. As to this stock, no collateral agreement was made, and it is not in issue.

In pursuance of the agreement of June 1st, relative to the $6,000, Herndon gave the required notice of demand for payment on July 1, 1911. Subsequently, at the request of the president of the mill, he agreed to extend the time of payment another year, under the existing contract. Again, in 1912, he gave the required notice of demand of payment on July 1, 1912. On being told by the president that the mills could not pay him then, he demanded and received the following additional agreement:

(*Exhibit "C."*)

"Yorkville, S. C., June 17, 1912.
Prof. R. J. Herndon, Yorkville, S. C.

Dear Sir: Referring to certain obligations of this company held by you, these papers will be paid to you as follows: $2,000 on October 15, 1912; $2,000 on November 15, 1912; $2,000 on December 16, 1912. Yours truly, (Signed) J. G. Wardlaw, President and Treasurer."

On October 9, 1912, the principal action above entitled, which is a creditor's bill, was commenced for the appointment of a receiver, sale of the assets and payment of the debts of the corporation. A receiver was appointed, creditors were called on to prove their claims and enjoined from proceeding otherwise. Under the call for creditors, Herndon presented this claim, alleging that in the transaction above set forth, he loaned the corporation $6,000, and received the stock as collateral security for the payment thereof. The receiver denied liability of the corporation on the allegation that Herndon was a stockholder and not a creditor. The clerk of Court, to whom it was referred to take proof of claims, sustained Herndon's contention, and

his findings and conclusions were confirmed by the Circuit Court.

It will be seen at a glance that the pivotal question in the case is was Herndon a creditor or a stockholder? In solving that question, the Circuit Court admited in evidence, over appellant's objection, the agreement of April 4, 1910, and the letter of June 17, 1912, above quoted, and parol testimony of the facts and circumstances existing and surrounding the parties at the time of the transaction, and also of their agreement that it was intended to be a loan with the stock as collateral security therefor.

If the testimony was competent, it abundantly established Herndon's contention. But appellant strenuously urges that it was incompetent because violative of the rule that parol testimony is inadmissible to contradict or vary the terms of a written instrument. The rule is well settled, but it is not inflexible, and it has limitations and exceptions which are as well settled as the rule itself.

It is not and cannot be contended that the agreement of April 4, 1910, or the letter of June 17, 1912, violate the rule, for they are in writing, but these are objected to on the ground that the one was merged in the agreement of June 1, 1910, and the other affords only an inference of the interpretation of that agreement by the parties themselves, while its true meaning is to be interpreted by the Court from the language therein used by the parties.

No doubt the general rule of interpretation of contracts is that, where they are plain and unambiguous, the Court shall ascertain the intention of the parties thereto from the language used by them. But when the construction is rendered doubtful by the language used, with the view of ascertaining their true meaning and the intention of the parties, the Courts look not only to the language employed, but to the subject matter and the surrounding circumstances, so that they may view them in the same light that the parties did, when they executed them. In such cases, previous collo-

quium and all writings which led up to the contracts are admissible, not to vary or contradict them, but merely to explain them and aid in their interpretation. So, too, in such cases, the practical construction which the parties themselves have given them, as indicated by their acts under them, may be shown as reflecting their intention in making them. These principles are well sustained by the authorities, and under them the evidence objected to was admissible, because the contract of June 1, 1910, was one of doubtful interpretation. If Herndon was to be only a stockholder, why was that agreement made? If the transaction was intended to be an absolute sale of the stock, as the agreement in its first clause declares, there was no reason for doing more than accepting his money and issuing to him the certificates of stock. That was all that was done when he took the $2,500 worth of preferred stock which he purchased outright. It may be said, however, that the writing was necessary to show that the stock was to bear eight instead of seven per cent., as provided in the resolution for its issue, and that it was to be redeemed by the corporation in a shorter time than that specified in the resolution for the retirement of the preferred stock. While these provisions of the contract are consistent with that view of the transaction, they are equally consistent with the construction that it was a loan with the stock as collateral security. If it be said that they are inconsistent with the latter view, because there was no authority to pledge the stock as collateral, it is answered there was no more authority to agree to pay eight per cent. dividends thereon, or to redeem it within the time fixed in the resolution.

It is not deemed necessary to consider or decide whether, under the circumstances, the president of the corporation could have pledged the stock as collateral security, or have made a contract binding on the corporation to redeem it within the time fixed in the resolution But his authority to borrow money and bind the corpora-

tion for the payment thereof is unquestioned. Therefore, if it be conceded that he had no power to pledge the stock, or bind the corporation by an agreement to redeem it at the time specified in the agreement, it does not affect Herndon's status as a creditor, since he claims no preference or priority under or by virtue of his having the stock.

But the agreement further provides that the corporation shall pay "interest" on the said $6,000, "that is, 1 per cent! in addition to the 7 per cent. dividend named in the certificates." The certificates provide for the payment of 4-6 *dividends,* not *interest.* The use of the word "interest" in the agreement sustains the view that the parties intended the transaction to be a loan.

The agreement also provides that, on July 1, 1911, after thirty days' notice, it might be terminated by either party, that is, the corporation had the right to pay back the money and demand the surrender of the stock, or Herndon had the right to demand payment of the money on surrender of the stock, a provision which is much more suggestive of a loan, with the stock as collateral security, than an absolute sale thereof.

There is another exception to the rule of evidence invoked by appellant under which the evidence objected to was admissible; and that is that where a deed appears on its face to be an absolute sale, it may be shown by parol evidence to have been intended only as a mortgage. We see no reason why this principle should not apply in this case. The rule should work both ways—it is said to be a poor rule that does not—and avail the mortgagee as well as the mortgagor.

The only other point which need be noticed is that the contracts show that they were made with Wardlaw personally, and not with York Cotton Mills,—the contention being that the words "President," or "Pt.," the abbre- 7, 8 viation for it, and such like words, after the name of Wardlaw signed to the agreement, are merely descriptive of the person. But the contracts show on their

face that they were made for the corporation and the evidence is undisputed that Wardlaw had authority to act for the corporation in borrowing money, that he did so act, and that the corporation got and used the respondent's money. It will not now be allowed to defeat its obligation upon such a technical ground.

Judgment affirmed.

MR. CHIEF JUSTICE GARY, being disqualified, did not participate in the hearing of this case.