12858

CATO v. ATLANTA & C. AIR LINE RY. CO. *ET AL.*

(152 S. E., 522)

May, 1928.

*Messrs. DePass & Wrightson, and Frank G. Tompkins,* for appellants,

*Messrs. Nicholls, Wyche & Byrnes,* and *Evans & Galbraith,* for respondent,

March 15, 1930.

The opinion of the Court was delivered by MR. JUSTICE BLEASE.

This action arose on account of the death of O. C. Cato, the respondent's intestate, who was killed on November 6, 1926, as the respondent alleged, by the negligence of the appellants, railroad companies.

The complaint, as originally brought, contained only one cause of action, and recovery of damage was sought under the laws of this State. To that complaint, the appellants, in their answer, alleged that at the time of the injuries sustained by Cato, which resulted in his death, he and the appellants were engaged in interstate commerce, and the appellants claimed the benefit of the provisions of the Act of Congress known as Federal Employers' Liability Act (45 USCA §§ 51-59). By leave of the Court, and with the con-

sent of the appellants, the respondent served an amended complaint setting up a second cause of action under the Federal Employers' Liability Act.

The intestate was in the employ of the appellants as a car repairer in the Hayne Yards near Spartanburg. On the day intestate was injured and killed, the general foreman, Watson, ordered Davis, the working partner of Cato, to get the latter, go by the blacksmith shop, get a carry arm, and to repair a certain baggage car then on track No. 10 in the yards. It was necessary for Cato, in repairing the car, to go underneath the same for the purpose of placing a bolt, or some other appliance, while the other men working with him lifted the drawhead on the end of the car. While so engaged, a locomotive, or shifting engine, of the appellants entered the track where the baggage car was standing, and this locomotive coupled to and pushed a cut of 52 cars, to which the baggage car was attached, it being the end car, over Cato and caused his death a few hours later. At the time of the accident, there was no signal indicating that workmen were under the car. Neither deceased nor Davis posted a blue flag at either end of the cut of cars.

The allegations of negligence charged against the appellants by the respondent were the same in both causes of action. She averred that the death of the intestate was due to the negligence, willfulness, and wantonness of the appellants in these particulars: In causing the locomotive to collide with the car under which Cato was working without notice and shoving the car over his body; in failing to provide him a safe place in which to work, although the extra hazards and dangers to which he was exposed were known; in failing to place upon its locomotive a proper lookout or to ascertain that the car under which the deceased was working was in proper condition to be moved, or that workmen were present and engaged in repairing the same; in failing to station a guard or lookout at the ends of the car, or to protect him in any way by flags or signals from the dangers which

appellants knew to exist, although it was their duty; that, effective March 1, 1926, the appellants entered into an agreement with the Brotherhood of Railway Carmen of America, which, according to its terms, was effective at the time of the death of respondent's intestate and at the commencement of this action, and that intestate was a member of said association at the time of his injury and death, and that the appellants' failure to furnish the protection contained in said agreement known as paragraphs 157 and 158 (set forth later) thereby caused his death.

The appellants, after pleading a general denial, defended the action on these grounds: At the time of his death, Cato was careless, negligent, willful, and wanton, because, contrary to the rules and regulations of appellants, he went into track No. 10 to repair a damaged baggage car without placing blue flags or any other signals to indicate to other workmen his presence, and although he knew, or ought to have known, that the switch engine was likely to come into this track at any time and shift the cars thereon, and although he knew he should not have attempted to do any work without first protecting himself, and that his negligence and willfulness combined and concurred with any negligence or willfulness on the part of the defendants as a proximate cause of his injury; that his injury and death were due to one of the risks assumed by him in taking employment as a car repairer, in attempting to repair a car without protecting himself by placing blue flags at each end of the cut of cars where he was working, although he knew that the same would have protected him, and although he knew that a switch engine was likely to come into said track at any time; and that his injury and death were due to the risks which he assumed incident to his employment and to his acting as he did at the time of his death; and that the risks so assumed were not due to appellants' violation of any statute enacted for the safety of their employees.

The cause was tried in the Court of Common Pleas for Spartanburg county before Hon. P. D. Barron, special

Judge, and a jury, and resulted in a verdict for the respondent on the first cause of action.

At the close of the evidence for the respondent, the appellants moved for a nonsuit as to both causes of action. The grounds of the motion as to the second cause of action, which was brought under the Federal Employers' Liability Act, were that there was no proof that the injury to, and the death of, the intestate resulted from any willfullness or negligence of the appellants in any of the particulars mentioned in the statute; that the entire evidence showed that the injuries and death of the intestate were due solely to his own acts of willfulness and carelessness; and that the injury and death resulted from risks assumed by the intestate. The same grounds were set up in the motion as to the first cause of action with the addition of another ground, to wit, that the evidence showed, as a matter of law, that Cato was, guilty of such contributory negligence as to bar recovery. The motions were refused.

At the close of all the evidence, the appellants moved for directed verdicts in their favor as to both causes of action on the same grounds before stated, and these motions were likewise refused. The presiding Judge, however, took the view that there was no evidence showing that Cato, at the time of his injuries and death, was "engaged in work on a car engaged in interstate commerce," and, with the consent of the respondent, granted a nonsuit as to the second cause of action; thereby he submitted to the jury the issues raised by the complaint and answer as to the first cause of action only.

In their appeal to this Court, the appellants present nineteen exceptions, by which they complain of the refusal to admit certain evidence offered by them, the failure to grant their motions for a nonsuit and a directed verdict, the refusal to grant certain of their requests to charge and certain instructions given in the charge. We shall not undertake to treat these exceptions separately, but we will cover all of them generally.

We take up first what we conceive to be the most important question raised by the appellants, that which relates to the refusal of the Court to allow them to offer certain evidence. For a full understanding of this question, it is necessary to refer again to the pleadings in the cause. In both causes of action, the respondent alleged that the agreement, effective March 1, 1926, between the appellants with the Brotherhood of Railway Carmen of America, of which Cato was a member and which agreement applied to him, was of force at the time of Cato's injuries and death, and that the same contained the following provisions:

"157. Protection for Repairmen: Switches *or* repair tracks will be kept locked with special locks and men working on such tracks shall be notified before any switching is done. A competent person shall be regularly assigned to perform this duty and held responsible for seeing it is performed properly. (Emphasis added.)

"158. Trains or cars while being inspected or worked on by train-yard men will be protected by a blue flag by day and blue light by night, which will not be removed except by men who place them."

The paragraphs or rules quoted (and we shall hereafter refer to them as rules) are set out in a printed book called "Agreement" between Southern Railway Company, one of the appellants, and many other railroad corporations, and a number of associations of certain railroad employees, including the Brotherhood of Railway Carmen of America. This agreement became effective March 1, 1926, but it does not appear upon what date it was executed.

The agreement was signed, as the printed copy shows, by H. W. Miller, vice-president of Southern Railway Company, for that company, and the other interested railroad companies, and by various representatives of the crafts, who were parties, including W. W. Dyke, general chairman of the Brotherhood of Railway Carmen of America. It appears that Mr. C. J. Mackay, vice-president of the Southern Rail-

way Company, later mentioned herein, did not sign the agreement, but represented the railroad companies at the negotiations which led to the making of the agreement, later signed by vice-president Miller.

The agreement is made up of several parts. The first, not styled in the beginning as "General Rules," is referred to in other places, however, by that term, and was evidently intended as general rules affecting all the crafts which were parties to the agreement. The General Rules embrace Rules 1 to 59, inclusive. There are special rules set forth for the various crafts. The "Special Rules" as to "Carmen," a short term for the Brotherhood of Railway Carmen, are contained in Rules 148 to 174, inclusive. Rule 175 is headed: "miscellaneous."

Rule 55 of the General Rules is as follows:

"Employees required to work under locomotives and cars:

"No employee will be required to work under a locomotive or car without being protected by proper signals. Where the nature of the work to be done requires it, locomotives or cars will be placed over a pit, if available."

Rules 157 and 158, already quoted, are found in that part of the agreement relating to "Carmen's Special Rules."

In the Miscellaneous Rule (175), these provisions are found:

"Except as provided for under the special rules of each craft the general rules shall govern in all cases.

"This agreement supersedes and cancels all previous agreements and understandings and constitutes the sole agreement between the company and the employees affected."

In connection with all the rules heretofore mentioned, the appellants were allowed to introduce in evidence certain rules of the Southern Railway system, effective August 1, 1923, the printed copy of which shows that they were issued by H. W. Miller, vice-president of Southern Railway Company. These rules were not a part of any agreement between the railroad companies and the crafts heretofore mentioned.

Stress was laid upon Rule No. 26. This rule is referred to often by railroad employees and the courts as the "blue flag rule," and is as follows:

"26. A blue flag, displayed at one or both ends of an engine, car or train, indicates that workmen are under or about it; when thus protected it must not be coupled to or moved. Workmen will place the blue signals and the same workmen are alone authorized to remove them. Other cars must not be placed on the same tracks so as to intercept the view of the blue signals, without first notifying the workmen."

Printed copies of the agreement as well as the printed rules of the Southern Railway system were furnished the employees of the appellants, including Cato. The appellants introduced the written application of Cato for employment as a car repairer of the appellant Southern Railway Company, signed by him on April 30, 1909, in which he agreed to "study the rules governing employees on this road carefully, keep informed and obey them."

Prior to the commencement of the trial, respondent served proper notice requiring the appellants to produce the original of the printed agreement, effective March 1, 1926. The original, signed "Agreement," if it existed, was not produced however. There was sought to be offered by the appellants through their witness Dyke, a mimeograph paper referred to as "Memorandum of rules agreed upon, etc." This paper, referred to in the court below, and termed by us, as "The Memorandum of 1921," was not admitted in evidence by the presiding Judge. The appellants contended that there had been no original of the agreement signed by the representatives of the railroad companies and the representatives of the interested crafts; and that the agreement was printed from a mimeograph copy similar to the one offered to the Court. "The Memorandum of 1921," with interlineations and erasures shown thereon, appears, with one exception, referred to hereinafter, to agree with the printed copy of the

Agreement. The appellants wished to show by their witnesses Dyke and Mackay that these gentlemen, representing their respective principals, were in conferences from time to time for the purpose of making an agreement between the railroad companies and the crafts; that the final agreement, effective March 1, 1926, was the result of these negotiations; and that the word *"or,"* in Rule 157 of the Agreement, was a typographical error; that the letter "r" should have been printed the letter "f," so that the word "of" should have appeared in the Rule instead of the word "or." As contended for by the appellants, the provision of Rule 157, as to "locking," should have read, "Switches *of* repair tracks will be kept locked with special locks.  *   *   * " The appellants showed by their witness Watson, the foreman, that track No. 10, where Cato was working at the time he was killed, was a track in the transport yard, where cars are being constantly shifted and switched; that there were no locks on track No. 10, and repairs on this track were only temporary for the purpose of getting the cars so repaired there to the regular shops; that tracks Nos. 1 and 2 are regular repair tracks, where permanent repairs to cars are made; and that these tracks have an arrangement called "locks" or switches, operated by special men, for the purpose of protecting workers employed in repairing cars thereon. Appellants claimed also, and attempted to prove, that it was an absurdity to speak of "locking" a whole track; that the locking of the switches had the effect of putting the track, controlled by its switch, in a condition that an engine or car could not go into it.

It will be seen, therefore, that the difference between the positions of the appellants and the respondents was this: The appellants claimed that under Rule 157, the word "or" changed to read "of," as it was proper to do under the circumstances, would not have required them to lock track No. 10 while the baggage car was being repaired only temporarily by Cato and his fellow worker, Davis. On the other

314

hand, the respondent contended that it was the duty of the appellant, under Rule 157, to see that track No. 10 was locked while the repair work on the car was being performed. The respondent argues to this, Court that if the word "or," in Rule 157, is not plain enough to show that the appellants were required to lock track No. 10, then the Court, under a well-recognized legal principle, may construe the word "or" as meaning "and," so that the expression in the rule should be "Switches *and* repair tracks will be kept locked. * * * "

In the trial, the presiding Judge, both in his rulings as to the admissibility of the proffered evidence and in his charge to the jury, took the position, in effect, that the word "or" carried its usual meaning, and construed Rule 157 as requiring the appellants to lock track No. 10 while repair work was being performed thereon. He held also that the appellants having failed to offer the *original* agreement between the railroad companies and the crafts, they could not introduce the evidence of Dyke and Mackay with "the memorandum of 1921" to show that the letter "r" in the word "or" was a typographical error; that it should have been an "f" so as to make the disputed word "of" instead of "or." As disclosed by the record, we gather that the Court was of the impression that the appellants were seeking to introduce evidence to vary the terms of the agreement, effective March 1, 1926, as shown by the printed copy of that agreement presented to the Court; that they could only do this by proof of the signed original agreement; and that parol evidence could not be offered for that purpose.

We think the Court misunderstood the purpose of the appellants, and, for that reason, he fell into error. The appellants did not seek to vary the terms of the agreement. They contended that the word "or" was a typographical error, and that its appearance in the rule in place of the word "of," which was the correct word, had the effect of making Rule 157 not only ambiguous but absurd and nonsensical.

The testimony of Watson, coupled with the evidence sought to be offered through Dyke and Mackay, tended to support the claim of the appellants that the word "or" was a misprint, and that the language of the rule contained an ambiguity. A few authorities are cited to bear out our view that, for the purpose of making clear the intention of Rule 157, the presiding Judge should have admitted the evidence which the appellants sought to introduce.

"Clerical errors in a written instrument may be corrected by extrinsic evidence, and the same rule applies to typographical errors in printed matter." 22 C. J., 1148.

"Parol evidence is admissible to explain the signification of words according to the usage of those accustomed to make contract of the kind in issue where the meaning is not plain." *Forbes & Co. v. Pearson,* 87 S. C., 67, 68 S. E., 964 (Syllabus).

"Where a written contract is ambiguous, the practical construction which the parties themselves have given to it, as indicated by their acts, may be shown as reflecting their intention." (Syllabus) *Herndon v. Wardlaw,* 100 S. C., 1, 84 S. E., 112.

"Where the construction of the language of a contract, considered alone, is doubtful, it is the Court's duty to inform itself of the surrounding circumstances and to consider the preliminary negotiations, so that the language employed may be given the intended effect." (Syllabus' *Breedin v. Smith,* 126 S. C., 346, 120 S. E., 64.

"Where an ambiguity arises, not upon a consideration of the words of an instrument as viewed in themselves, but upon those words when applied to the object described, or where a resort to extrinsic facts will remove an ambiguity, the question of interpretation is for the jury." (Syllabus) *Ibid.*

"Construction of contract which is ambiguous, or capable of more than one construction, is question of fact." (Syllabus) *Sirrine v. Graham,* 136 S. C., 448, 134 S. E., 415.

"It is a familiar canon of construction that, if contract is doubtful in meaning, the Court may look into the construction which the parties themselves have placed on it, to reach the true intention, which is the object of all judicial interpretation." (Syllabus) *McGregor v. Hurst,* 140 S. C., 464, 138 S. E., 865.

The exceptions of the appellants complaining of error on the part of the presiding Judge in refusing to allow them to examine the witnesses Davis, Senn, Watson, Dyke, and Mackay, as to the meaning of the expression "Switches or repair tracks," appearing in Rule 157, and the exception which refused them the right to offer "The Memorandum of 1921," are sustained.

At first, the trial Judge allowed the appellants to bring out from their witnesses Watson and Manning testimony to the effect that it was the duty of the intestate, Cato, to place the "blue flag" signals at the ends of the car before he went to work thereunder. A little later, on consideration of the meaning of Rule 158, quoted above, he directed the jury not to consider the testimony mentioned. After reading Rule 158 to the jury, the Judge said: "I charge you as to that section, Mr. Foreman, that the railroad company, under this head of 'Protection for Repairmen,' by that provision agreed that trains or cars while being inspected or worked on by train yard men will be protected by blue flag by day and blue light by night; and that under this provision it became the duty of the railroad company to see that such protection was afforded by the paragraph." A little later, he also told the jury this: "Now, Mr. Foreman and gentlemen of the jury, in the event of any conflict between the rule book effective August 1, 1923 (the printed rules of Southern Railway system, containing Rule 26, the blue flag rule), and this agreement, this agreement (the agreement effective March 1, 1926), must prevail, as I stated to you." The insertions in parenthesis are made by us.

The appellants impute error on account of the Court's ruling as to the testimony and the instructions he gave. It is our opinion that the Judge was correct as to the holdings he made. It is undisputed that Cato was a member of the Brotherhood of Carmen at the time of his death. The agreement, effective March 1, 1926, was made for his benefit, as well as for the benefit of all others affected by its terms, and that agreement was in force at the time of Cato's death. In the general rules set forth in the agreement, which applied to all the employees who are members of the crafts, who entered into the agreement, Rule 55 plainly said: *"No employee will be required to work under a locomotive or car without being protected by proper signals."* Rule 158, contained in the "Special Rules as to Carmen," is not inconsistent with Rule 55 of the general rules. On the contrary, the two rules are in absolute harmony. Rule 158 provides: "Trains or cars while being inspected or worked on by train-yard men will be protected by a blue flag by day and a blue light by night. * * *" The General Rule (55) is an agreement on the part of the railroad companies that they will protect an employee working under a locomotive or car by proper signals. Rule 158 only goes farther and states that the railroad companies will protect trains or cars while being worked on by train-yard men with certain kinds of signals, namely, a blue flag by day and a blue light by night. The old Blue Flag Rule, No. 26, contained in the book of rules of Southern Railway system, may apply, under certain circumstances, to certain employees of that railroad system. They did not apply, however, to the employees affected by the later agreement, effective March 1, 1926. The last agreement, effective March 1, 1926, by Rule 175, the miscellaneous rule, expressly provided that that agreement superseded and cancelled all previous agreements and understandings. And we think that it was clearly the intention of the parties to the agreement, effective March 1, 1926, so far as members of the crafts, who were parties to that agreement

are concerned, to change the Blue Flag Rule. It is very significant to our minds that the language of the old rule, "Workmen will place the blue signals and the same workmen are alone authorized to move them," was left out of Rule 158 of the last agreement. Neither can we agree with the appellants that Cato was bound to observe the old "Blue Flag Rule" because of the statement made in his written application for employment. The agreement made by Cato in that paper was that he would obey the rules governing employees. Until the Blue Flag Rule was changed for the protection of carmen, it was Cato's duty to obey it. After the rule was changed, however, it was his duty not to obey a rule which had been revoked or modified, but to obey the new rule.

We are unable to agree with the position which it appears that the appellants take in their argument, that the case of *Owens v. A. C. L. Co.,* 141 S. C., 359, 139 S. E., 779, conflicts with the rulings of the presiding Judge, now under consideration, as to the effect of the "Blue Flag Rule," Rule 26 of the Southern Railway system. The injuries to, and the death of, Owens, because of which the suit last mentioned was instituted, occurred on March 16, 1923, which was prior to the last agreement involved in this case, effective March 1, 1926. That agreement was not involved in the *Owens case.*

We do not regard it as necessary to review the evidence in the case in order to dispose of the exceptions of the appellants, which impute error to the trial Judge in refusing to grant their motions for nonsuit and for directed verdict. It is our opinion that the evidence was entirely sufficient to require a submission of the issues to the jury for determination as to the first cause of action.

If there was any evidence at all to show that the deceased, Cato, was engaged in interstate commerce at the time he received his injuries, that resulted in his death, it was certainly scant. We do not think it proper to say now whether or not

there was error on the part of the presiding Judge in refusing to grant appellants' motion for a directed verdict as to the second cause of action, and permitting the respondent to take a nonsuit thereon. The true information as to whether the action should have been brought under the Federal Employers' Liability Act or under the laws of South Carolina should be within the knowledge of the appellants, and they should disclose the information fully and freely if they have it. If the respondent is entitled to bring her action under the Federal Employers' Liability Act, in the interest of justice, this Court, at this stage, should do nothing to preclude her from that right. Under all the circumstances, therefore, it is our opinion that the case should be left open so as to permit the respondent to proceed with her cause of action under the Federal Employers' Liability Act, if evidence may hereafter be obtained to show that her intestate was engaged in interstate commerce at the time he was injured and killed.

The Court below had the right, if it thought proper to do so, to submit to the jury the two phases of liability: (1) The right of recovery under the Federal Employers' Liability Act; and (2) the right of recovery under the allegations of willfulness as stating a cause of action within the provisions of the state statutes. See *Jenkins v. Southern Railway,* 152 S. C., 386, 150 S. E., 128, decided since this case was heard in the lower Court. The respondent may desire, since the decision in the *Jenkins case,* to follow the procedure recognized and approved by the decision there.

It is the judgment of this Court that the judgment below be, and the same is hereby, reversed, and the cause remanded to the Court of Common Pleas of Spartanburg County for a new trial as to the first cause of action, with the right to the respondent to set up again the second cause of action and proceed to trial thereon, if she shall be so advised.

MR. CHIEF JUSTICE WATTS and MESSRS. JUSTICES COTHRAN, STABLER and CARTER concur.