13240

CATO v. ATLANTA & C. A. L. RY. CO. *ET AL.*

(162 S. E., 239)

124

*Messrs. F. G. Tompkins, A. E. Hill* and *H. E. DePass,* for appellants,

*Messrs. Evans & Galbraith* and *Nicholls, Wyche & Byrnes,* for respondent,

September 10, 1931.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BLEASE.

In the first trial of this cause, a judgment in favor of the respondent was reversed, and a new trial ordered. *Cato v. A. & C. Air Line Ry Co. et al.,* 155 S. C., 304, 152 S. E., 522, 527. In the second trial before Hon. T. S. Sease, presiding Judge, and a jury, in the Court of Common Pleas for Spartanburg County, the respondent again recovered judgment, and this appeal is therefrom.

The statement of facts on the part of the respondent seems to us to be so full and fair, and the argument in her behalf on the legal questions involved cover so clearly the issues to

be determined, that we have drawn extensively from these in the preparation of this opinion.

In connection with this opinion, in order for it to be fully understood, we refer to the former opinion, where this Court, on a matter of evidence, reversed the lower Court and unanimously held that the respondent was entitled to have her case submitted to the jury. The conclusions announced in that case became and are "the law of the case," and we are still satisfied with the holdings there made.

The action was brought by Mrs. Verna Cato, as administratrix of the estate of her deceased husband, O. C. Cato, to recover damages for the benefit of herself and three minor children against the Southern Railway Company *et al.*, for the wrongful death of her husband.

The complaint alleges two causes of action; the first under the State law, and the second under the Federal statute. Both causes of actions were submitted to the jury under proper instructions by the Court. The Supreme Court, in the first appeal, reversed a judgment for the respondent and sent the case back for a new trial upon the ground that the presiding Judge erred in construing the terms of Paragraph 157 of a certain agreement entered into between the Southern Railway Company, and others, and the Brotherhood of Railway Carmen of America. Before the second trial, respondent secured an order allowing her to amend her complaint by striking out Paragraph 157 of the said agreement, and the cause proceeded to trial on the complaint, thus amended.

O. C. Cato was employed by the appellants as a car repairer, under the supervision and control of R. W. Watson, general foreman of appellants' yards at Hayne Junction, and on December 6, 1926, was ordered by appellants to proceed to track No. 10 and repair the drawhead of a baggage car which had two days before been placed on that track. Cato was informed that the drawhead of the car must be repaired

so it could be taken to the car repair shop of the Southern Railway Company, about one and a half miles from Hayne Junction, in Spartanburg County, for general repairs.

It was necessary for Cato to go underneath the baggage car to perform his duties and, while there engaged in repairing the car, a switch engine backed into a cut of cars coupled to the baggage car, underneath which Cato was working, causing the wheels of the baggage car to pass over his body, horribly mutilating him, subsequently causing his death. Appellants failed to protect Cato and the other men working upon the said baggage car with a blue flag, as required by the agreement entered into between the Southern Railway Company, and others, and the Brotherhood of Railway Carmen of America, and others, effective March 1, 1926, which superseded all other rules and agreements up to that date, copy of which agreement was delivered to Cato by the railway company, and under the guidance of which he performed his duties as a car repairer for the appellants, and upon which he relied for protection while repairing the baggage car upon the said track. The agreement upon which the action is based provides, among other things:

"55. *Employees Required to Work Under Locomotives and Cars.*—No employee will be required to work under a locomotive or car without being protected by proper signals. Where the nature of the work to be done requires it, locomotives or cars will be placed over a pit, if available."

"158. Trains or cars, while being inspected or worked on by train-yard men, will be protected by a blue flag by day and a blue light by night, which will not be removed except by men who place them."

"163. *Carmen Sent Out on Road to Perform Work.*— When necessary to repair cars on the road or away from the shops, carmen will be sent out to perform such work. Two carmen, or one carman and an experienced apprentice, or one carman and an experienced helper, will be sent to perform such work as putting in couplers, draft rod, draft tim-

bers, arch bars, truss rods, and wheels and work of similar character."

"175. *Miscellaneous.*—Except as provided for under the special rules of each craft, the general rules shall govern in all cases."

"This agreement supersedes and cancels all previous agreements and understandings and constitutes the sole agreement between the company and the employees affected.

"These rules and rates of pay agreed upon become effective as of March 1, 1926, and shall remain in effect until June 30, 1927, and thereafter until thirty (30) days' written notice shall be given by either party to the other of a desire to change: Provided, however, that the said thirty (30) days' notice herein referred to may be given by either party on or after May 31, 1927."

The appellants' appeal to this Court contains twenty-three exceptions, but they appear to present only four questions which we shall consider.

Did the presiding Judge err in refusing motions for a nonsuit and directed verdict? Exceptions 2, 3, 11, 12, and 13.

The record shows that appellants did not move for a nonsuit or a directed verdict as to the first cause of action upon the ground that there was *no evidence* to show that the deceased, at the times of his injuries and death, was engaged in intrastate work, but asked the Court to grant a nonsuit and direct a verdict as to the first cause of action upon the ground that "it appears from *all the evidence* in this case that the action is controlled by the Employers' Liability Act of Congress." The motions were not made upon the *absence of evidence,* but the Court was asked to grant a nonsuit and direct a verdict upon all the proof submitted. A motion for a nonsuit or a directed verdict can only be granted by the Court upon the entire absence of evidence. It can never be granted by the Court upon an "appearance from all the evidence." The trial Judge has no power to weigh the evidence. Constitution, Art. 5, § 26. Therefore, it is doubt-

ful if a proper motion for a directed verdict or nonsuit has been made in this case.

Conceding the motion to have been properly made, however, an inspection of the printed case in the first appeal and of this appeal will disclose that the evidence, in substance, is practically the same in each. It is only necessary to cite the decision of this Court in this case on the first appeal, where the Court unanimously decided that the evidence was entirely sufficient to require a submission to the jury for determination of the first cause of action. We there said, "If there was any evidence at all to show that the deceased, Cato, was engaged in interstate commerce at the time he received his injuries, that resulted in his death, it was certainly scant"; and that "The true information as to whether the action should have been brought under the Federal Employers' Liability Act or under the laws of South Carolina should be within the knowledge of the appellants, and they should disclose the information fully and freely if they have it."

Notwithstanding the duty imposed by this Court to disclose what kind of commerce the baggage car was used in, and notwithstanding admission of appellants on the second trial that a record of all cars was kept by the appellants, the appellants failed to sufficiently disclose what kind of commerce, if any, the baggage car was used in. The record, however, in this appeal shows to our entire satisfaction that the baggage car upon which Cato was working at the time of his injuries and death had been withdrawn from whatever service it had been in for the purpose of sending it to Hayne shop, in Spartanburg County, S. C., for general repairs. The car was picked up in Columbia, S. C., as a "dead soldier," without even a waybill, and hauled by a freight train in charge of Conductor Humphries from Columbia, S. C., to the Hayne yards, at Hayne, S. C., where it arrived about 8 p. m. on December 4th. The train with which the baggage car came to Hayne yards was placed on one of the yard

tracks and later broken up to be made into trains to be sent to other points, and at the time of the injuries and death of Cato the baggage car was not connected with any of the cars, engine, or crew that it came from Columbia with, and had no relation whatsoever to the freight train from Columbia.

It appears from the record that all trains that come into Hayne yards are broken up and made into other trains that go to different points. That the western end of track No. 10 is used for storage track for "bad order" cars destined to Hayne shops; that the day Cato was killed the baggage car was attached to a cut of cars, but those cars had no relation to the baggage car and were not a part of any train. They were simply put on to the storage track to be made up into different trains at a later time.

It was proved by both parties at the trial of this case that no blue flag or other signals were placed by the appellant company, as required by the contract with the craft, the appellants' counsel contending that the general rule, which required the workmen to place the signals, governed the conduct of the parties, and not the agreement. This Court has ruled to the contrary. So the case is narrowed, so far as the facts are concerned, to the question, "Was the deceased Cato at the time of his injury engaged in interstate commerce?"

The complaint contained two causes of action, the first being an action under the State Liability Act, the second an action under the Federal laws. This practice has been decided to be proper by this Court (first appeal). The respondent contended that the action was one of intrastate and produced no evidence to show that interstate traffic was involved. It appears from the appellants' testimony that the car upon which the deceased Cato was working was lying on a side track in the yards of the defendant at Columbia, S. C.; a freight train conductor, seeing it in a state of want of repair, without any instructions or bill of lading, took the baggage car and brought it to Hayne yards, near Spartanburg,

in this State. These yards are the depository for all cars needing repairs at the shops, which are a mile and half from the yards, but under the same superintendent. There is no station at the shops, and all freight trains upon reaching the yards, are broken up and the cars of such trains reformed and placed in position to be taken up by or formed into other trains. The western end of track No. 10, upon which this broken and unfit baggage car was placed, was the depository for all damaged cars intended for Hayne car shops, where such repairs are made. These cars were then taken in charge by an engine from the shops, or a shifting engine, and carried to the shops, where they were left for repairs for an indefinite time. The foreman, upon examining these cars, found that the baggage car brought from Columbia without a bill of lading had a drawhead which was pulled out, rendering it impossible to be moved. He took a part of the broken drawhead, left it at the blacksmith's to be repaired, and then ordered Mr. Davis, a yard car repairer, to get his "partner" and proceed to repair the drawhead on the disabled car. Mr. Cato was secured, and, arriving at the car, Cato proceeded to go underneath, the necessity requiring it, Davis remaining on the outside. While they were working on the car a shifting engine backed in upon them, setting the car upon which Cato was working in motion, running over his body, of which injuries he died in the afternoon.

Respondent rested her case upon the following undisputed facts: (1) The baggage car was found on track No. 10, wounded, damaged, unfit, and not engaged in commerce of any kind, but waiting to be repaired at a point within the State of South Carolina and destined for the shops at Hayne, in the State of South Carolina. The car was ordered by the foreman to be repaired and placed in condition to be taken to the shops by a shifting engine used for that purpose, and not by any train engaged in commerce of any kind, interstate or intrastate. (2) The contract of the company with the United Carmen, or the craft, as it is called,

which (under the decision of this Court), made it the duty of the appellant employer to protect workmen in the position of the deceased by placing a blue flag by day and blue light by night. (3) The failure of the company to perform its duty, and as a direct cause of such negligence the death of the deceased. This made a *prima facie* case of intrastate commerce, and falling directly under the laws of the State of South Carolina. Under such circumstances, the law presumes the subject-matter to be intrastate, and a *prima facie* case was made against the appellants. *Trimmier v. Railway Company,* 81 S. C., 203, 62 S. E., 209; *Garner v. Telegraph Company,* 87 S. C., 316, 69 S. E., 510. The Judge refused to direct a verdict for the appellants or grant a nonsuit. The appellants attempted to show by their evidence that the question of interstate commerce was involved, and that the case fell under the Federal Employers' Liability Act (45 U. S. C. A., §§ 51-59). There is little, if any, testimony showing that this car was engaged in interstate commerce. The appellants showed by competent testimony that every other car disabled, in want of repair, lying on the same track with the car upon which Cato had worked, was sent to the Hayne yards from different parts of the country and other States, but all detached and placed upon this track. No sufficient testimony was offered to show where this baggage car originated, came from, or what traffic it had been engaged in, or why it was left abandoned in Columbia. Most of the witnesses professed absolute ignorance of anything concerning this car. Testimony was brought out, however, that the records in Columbia should show where the car came from, what it was used for, when it was ordered to be sent to the shops, by whom, and for what purpose. This Court held in this case that, the information to prove this important fact being in possession of the appellants, it was their duty to furnish the evidence, and yet they failed, or refused, to so show. They did show that the baggage car was found abandoned in Columbia, engaged in no commerce of any kind, and picked up

without a waybill by a sympathetic conductor, who brought the sufferer to the shops, as he thought must have been intended. The only record introduced was the notebook of the conductor, stating where he picked up the car and where he brought and left it. This is all the evidence concerning the car, except the fact that an engine from the shops came down and carried it a mile and a half to be repaired.

Deceased, Cato, is presumed to have been engaged in intrastate commerce at the time of his injuries and death. The railway company must show affirmatively that Cato was engaged in interstate commerce before the case can be considered under the Federal statute. *Wabash Railway Co. v. Hayes,* 234 U. S., 86, 34 S. Ct., 729, 58 L. Ed., 1226.

"The employee at the time of the injury must be engaged in interstate transportation or in work so closely related to it as to be practically a part of it, in order to displace State jurisdiction and make applicable the Federal Act." *Industrial Accident Commission v. Payne, Agent, etc.,* 259 U. S., 182, 42 S. Ct., 489, 491, 66 L. Ed., 888.

*Even if the baggage car had been used in interstate traffic, it had been withdrawn for general repairs, and the Federal statute would not apply.*

The Judge charged the jury as follows: "I charge you that equipment out of use, withdrawn for repairs, may or may not partake of an interstate character, according to the circumstances, and among the circumstances is the time withdrawn for repairs, the duration of the withdrawal from use, and I charge you that if you find from the testimony in this case that the baggage car had at the time of Cato's injuries definitely been withdrawn from whatever service it was in for the purpose of general repairs, then, under such facts, you would find the deceased Cato was not engaged in interstate commerce at the time of his injuries and death, and if you find for the plaintiff, your verdict would be under

the First Cause of Action instead of the Second Cause of Action."

The jury could have found under this instruction from the Court that, even if the baggage car had been used in interstate commerce, it had, before and at the time of Cato's injury, definitely been withdrawn for the purpose of general repairs, and hence they were justified in finding their verdict.

"A machinist's helper, engaged, while making repairs in the roundhouse, upon an engine which had been used in hauling over the railway company's lines freight trains carrying both intrastate and interstate freight, and which was used in the same way after the accident was not then employed in interstate commerce within the meaning of the Federal Employers' Liability Act of April 22, 1908 (35 Stat. at L., 65, Chap. 149 [Comp. St., 1913, §§ 8657-8665 (45 U. S. C. A., §§ 51-59])), governing the liability of an interstate carrier for injuries to its employees when employed in interstate commerce." *Minneapolis & St. L. Ry. Co. v. Winters,* 242 U. S., 353, 37 S. Ct., 170, 61 L. Ed., 358, Ann. Cas., 1918-B, 54.

"This is not like the matter of repairs *upon a road permanently* devoted to commerce among the States. An engine, *as such,* is not permanently *devoted to any kind of traffic,* and it does not appear that this engine was destined especially to anything more definite than such business as it might be needed for. It was not interrupted in an interstate haul to be repaired and *go on.* It simply had finished some interstate business and had not yet begun upon any other. Its next work, so far as appears, might be interstate or confined to Iowa, as it should happen. At the moment it was not engaged in either. Its character as an instrument of commerce depended on its employment at the time, not upon remote probabilities or upon accidental later events." *Minneapolis & St. L. Ry. Co. v. Winters,* 242 U. S., 353, 37 S. Ct., 170, 171, 61 L. Ed., 358, Ann. Cas. 1918-B, 54; *Industrial Accident*

*Commission v. Payne, Agent,* 259 U. S., 182, 42 S. Ct., 489, 66 L. Ed., 888.

A baggage car is used for the purpose of hauling baggage just as an engine is used for the purpose of pulling trains. At the time of the injury, the baggage car was not engaged in transporting baggage, either interstate or intrastate, but had been withdrawn at Columbia from whatever commerce it had been engaged for the sole purpose of being repaired at the car repair shops at Hayne, S. C., *Chicago, etc., Ry. Co. v. Kindlesparker,* 246 U. S., 657, 38 S. Ct., 425, 62 L. Ed., 925.

"The test of jurisdiction in repair cases is whether the rolling stock, engine or car is withdrawn from service at the time the repairs are made, as distinguished from being interrupted in the course of an interstate haul to go on." *James v. Chicago & N. W. Ry. Co.,* 115 Neb., 164, 211 N. W., 1003.

In *Heimbach v. Lehigh Valley Railway Company* (D. C.), 197 F., 579, it appeared that employees of a railway company were killed while repairing a car that had been transported from New Jersey to Pennsylvania, and during that transit had been engaged in commerce between the States, but it appeared that the car had reached its destination and was empty, and, having been found to need repairs, it was put upon a side track for that purpose.

It was held that the employees so engaged were not within the protection of the statute.

"Where a railroad engine previously employed in interstate commerce, was retired from service for repair in May, placed on a repair track until October, then removed to a roadhouse, where it was stripped and dismantled, the repairs were completed, and it was returned to service in December, plaintiff, who was injured October 27, while helping to dismantle it, was not at the time employed in interstate commerce." *Connolly v. Chicago, M. & St. Paul Ry. Co.* (D. C.), 3 F. (2d), 818.

"Employee, rethreading bolts used on engine withdrawn from interstate service for six days for repairs, held not engaged in interstate commerce." *Detroit, etc., v. Seigel* (Ohio App.), 153 N. E., 870; *Hines v. Industrial Commission,* 184 Cal., 1, 192 P., 859, 14 A. L. R., 720; *Clements v. Nashville, C. & St. L. Ry. Co.* (1925), 1 Tenn. App., 47; *Larkin v. Industrial Commission of Utah,* 60 Utah, 274, 208 P., 500.

"An employee who was injured while making repairs on engine which had previously been used in both interstate and intrastate commerce, but which was withdrawn from service for five days and placed in a roundhouse for repairs, which did not arise from a cause which interrupted a run, was not engaged in interstate commerce, and was therefore not entitled to recover under the Federal Employers' Liability Act [45 U. S. C. A., §§ 51-59]." *Conklin v. N. Y. Central Ry. Co.,* 206 App. Div., 524, 202 N. Y. S., 75, affirmed in 238 N. Y., 570, 144 N. E., 895, *certiorari* denied, 206 U. S., 607, 45 S. Ct., 93, 69 L. Ed., 465.

"Where a servant was injured by the negligence of his master while repairing a locomotive, which had been dismantled and undergoing general repairs, and which was out of service several weeks before and after the injury, and where other locomotives were engaged in the actual work for which the locomotive being repaired was bought and used, the liability for the injury is governed by State law, and not by the Federal Employers' Liability Act * * * even though such locomotive was intended to be used solely in interstate commerce." *New Orleans & N. E. Railway Co. v. Beard,* 128 Miss., 172, 90 So., 727, *certiorari* dismissed (1922), 260 U. S., 752, 43 S. Ct., 10, 67 L. Ed., 496.

"Car repairer working on a car which was entirely out of commission and was not being used for any purpose whatever was not engaged in 'interstate commerce.'" *Herzog v. Hines,* 95 N. J. Law, 98, 112 A., 315.

"An employee of a common carrier who is injured while at work in repairing rolling stock of the carrier, and which is out of use for the purpose of having the repairs made, is not injured 'while engaged in interstate commerce.'" *Price v. Railway Co.,* 99 N. J. Law, 425, 123 A., 756, 757; *Chesapeake, etc., Ry. Co. v. Mizelle,* 136 Va., 237, 118 S. E., 241; *Flack v. Atchison, etc., Ry. Co.,* 285 Mo., 28, 224 S. W., 415, 423, *certiorari* denied, 256 U. S., 690, 41 S. Ct., 449, 65 L. Ed., 1173.

In the last case, the Court said: "At the time of the accident here in suit, the engine in question was not being used in 'moving interstate or foreign traffic,' nor was it 'in the active service of such carrier in moving traffic' within the intent and purpose of that Act, as we construe it. The engine was undeniably being prepared for use in interstate traffic, and the deceased met his death while engaged in that preparation."

"Railway car repairer, who at time of injury was repairing car which had been wholly withdrawn from service and commerce of every character and placed on repair track, to be overhauled and rebuilt, and which had been in course of repair for nearly two months, was not engaged, and the car on which he was working was not employed, in interstate commerce." *Scoggins v. Railway Co.* (D. C.), 292 F., 162, 163.

In the case of *Philadelphia, etc., Railway Company v. Polk,* 256 U. S., 332, 41 S. Ct., 518, 65 L. Ed., 958, the Court said: "At the time of the occurrence of the injury the company was a common carrier, by rail, engaged in interstate and intrastate commerce, and that at such time there was a draft of freight cars attached to the engine which was in charge of the crew of *which Polk was a member.*"

Of course, if Polk was a member of the crew engaged in interstate commerce, the statute would apply, but, in the instant case, Cato was not a member of the crew of the train

that caused his death. He was repairing a baggage car that had been withdrawn from commerce for general repairs.

The Court, in this case cited by appellants, said: "The employment concerned both kinds of commerce and was to be exercised as much on one as on the other. In other words, was as much and as intimately directed to the interstate cars and freight as to the intrastate cars and freight."

In the case under discussion, the employment of Cato was not directed to any interstate cars, or any cars carrying interstate freight, but only to the baggage car that had been withdrawn from commerce for repairs.

In the case of *New York, etc., Railway Company v. Carr,* 238 U. S., 263, 35 S. Ct., 780, 781, 59 L. Ed., 1298, "the plaintiff was a brakeman on an interstate train. As such, it was a part of his duty to assist in the switching, backing, and uncoupling of the two cars so that they might be left on a siding in order that the interstate train might proceed on its journey. In performing this duty it was necessary to set the brake of the car still attached to the interstate engine, so that, when uncoupled, the latter *might return to the interstate train and proceed with it, with Carr and the other interstate employees,* on its interstate journey. * * * The fact that they might soon thereafter be used in interstate business did not affect their intrastate status at the time of the injury; *for, if the fact that a car had been recently engaged in interstate commerce, or was expected soon to be used in such commerce, brought them within the class of interstate vehicles, the effect would be to give every car on the line that character. Every case must be decided in the light of the particular facts with a view of determining whether, at the time of the injury, the employee is engaged in interstate business, or in an act which is so directly and immediately connected with such business as substantially to form a part or a necessary incident thereof."*

Cato's duties connected him in no way with interstate business at the time of his injury and death. The baggage

car which ran over him had been in the yard for two days, and was not moved to the Hayne shop until the next day. There is no evidence that on its journey to the shops the next day the baggage car had any connection with the cut of cars that backed into it. It would make no difference, however, if such cars did accompany the baggage car to the shops, for the baggage car had been withdrawn from commerce for repairs, and cannot be said to have been engaged in interstate commerce at the time of the injury. Cato was not a member of the crew handling the engine or cut of cars. He had no relation to any car except the baggage car that had been withdrawn from service for some time for the purpose of general repairs.

In the case of *St. Louis, San Francisco, etc., Ry. Co. v. Seale*, 229 U. S., 156, 33 S. Ct., 651, 653, 57 L. Ed., 1129, Ann. Cas., 1914-C, 156, the Court said: "The train for Oklahoma was not only an interstate train but was engaged in the movement of interstate freight; and the duty which the deceased was performing was connected with that movement, not indirectly or remotely, but directly and immediately."

The duty being performed by Cato was in no way connected with the transportation of the cars that backed into him. His duties related only to repairing the baggage car that had been withdrawn from commerce.

The case of *Pedersen v. Railway Company*, 229 U. S., 146, 33 S. Ct., 648, 57 L. Ed., 1125, Ann. Cas., 1914-C, 153, is no authority, for as stated by the United States Supreme Court in *Minneapolis & St. Paul Ry. Co. v. Winters, supra:* "This is not like the matter of repairs upon a *road* permanently devoted to commerce among the States."

A baggage car, as such, is not permanently devoted to any kind of traffic, and there is no testimony in the case to show that it was permanently devoted to interstate traffic. It was not interrupted *while engaged* in interstate commerce to be

repaired, but was withdrawn from commerce to be repaired. Picked up in Columbia, abandoned on a side track without a waybill, and brought to the shop for repairs, no one to this day knows where it came from, what it had been doing, or by whose authority it was carried to Hayne.

In the case of *Koennecke v. Railway Company,* 101 S. C., 86, 85 S. E., 374, and *Howell v. Railway Company,* 99 S. C., 417, 83 S. E., 639, there was an issue of fact whether the State or Federal law was applicable.

The respondent was authorized by the decision of the Court in the first appeal to proceed to trial on both causes of action and to have both phases of liability submitted to the jury. This procedure was approved in *Jenkins v. Railway Company,* 152 S. C., 386, 150 S. E., 128, 66 A. L. R., 416.

The jury found its verdict upon the first cause of action, and found that respondent's intestate was engaged in intrastate work at the time of his injuries and death.

Pleader may allege liability of defendant under both State and Federal law, and may recover under whichever appears under the evidence to be applicable. *Koennecke v. Railway Co., supra; Bankson v. Railway Co.* (D. C.), 196 F., 171; *Roberts, Federal Employers' Liability,* 268, § 152; *Railway Co. v. Hayes,* 234 U. S., 86, 34 S. Ct., 729, 58 L. Ed., 1226; *Osborne v. Gray,* 241 U. S., 19, 36 S. Ct., 486, 60 L. Ed., 865; *Roberts, Federal Employers' Liability,* 119, 120, §§ 51-58; *Railway Co. v. Lindsay,* 233 U. S., 44, 34 S. Ct., 581, 58 L. Ed., 838, Ann. Cas., 1914-C, 168.

Rules of evidence as to quantity of proof necessary to make out a *prima facie* case is that of the state where action is brought. *Bennett v. Railway Co.,* 98 S. C., 42, 79 S. E., 710 (affirmed in 233 U. S., 85, 34 S. Ct., 566, 58 L. Ed., 860); *Dutton v. Atlantic Coast Line Ry. Co.,* 104 S. C., 16, 88 S. E., 263.

The presumption is that Cato was engaged in intrastate work at the time of his injuries and death, and this presumption follows throughout the case, and the facts must go to the jury. *Trimmier v. Ry. Co., supra; Garner v. Telegraph Co., supra.* Both phases of liability, under the law, should have been submitted to the jury. The jury found upon the first cause of action, and it is binding upon the Court.

The appellants set up in their answer that the car was engaged in interstate commerce, and it became their duty to prove that fact. When a car comes from one point in the state bound for another in the same state, the law presumes that it is engaged in intrastate commerce, and he who alleges the contrary must overcome this presumption by positive testimony.

There the evidence was that plaintiff was moving freight, but neither the origin nor destination of the freight was shown; the burden as to this question was on defendant, since it must be held to knowledge of the actual movement of freight committed to its care. *Osborne v. Gray,* 241 U. S., 16, 36 S. Ct., 486, 60 L. Ed., 865; *Myers v. Chicago, etc., Ry. Co.,* 296 Mo., 239, 246 S. W., 257, *certiorari* denied, 261 U. S., 624, 43 S. Ct., 519, 67 L. Ed., 832; *Atchison, etc., Ry. Co. v. Industrial Commission,* 290 Ill., 590, 125 N. E., 380, *certiorari* denied, 252 U. S., 583, 40 S. Ct., 393, 64 L. Ed., 728.

This case was said, in *Philadelphia & R. R. Co. v. Polk, supra,* to be consistent with the rule there laid down. So in the instant case: "The railway company must be held to knowledge of the actual use the baggage car had been put to."

*The railroad authorities knew, or should have known, exactly where this car came from and between what points it was used, but did not offer sufficient competent testimony tending to show the fact. The reason is ap-*

*parent. They knew that it was a local car, and proved it so far as they went.*

Their witnesses swore that a record is kept in Columbia of these cars. It was not produced. Every disabled car on track No. 10 at Hayne yard was properly accounted for by waybills except the car upon which Cato was working. Only the conductor's notebook tells where it was picked up.

Did the presiding Judge err in not allowing parol testimony to vary the terms of the written contract between the Brotherhood of Railway Carmen of America and the Southern Railway Company et al., and in charging the jury that it was the duty of the railway company, and not that of respondent's intestate, to place the blue flag, as required by the agreement, and in refusing certain requests submitted by appellants relating thereto? Exceptions 1, 4, 5, 7, 8, 9, 10, 14, 15, 17, 18 and 19.

Our Court by its unanimous opinion and its refusal to grant a new trial upon practically the same grounds now complained of in the above exceptions, said:

"The appellants impute error on account of the Court's ruling as to the testimony and the instructions he gave. It is our opinion that the Judge was correct as to the holdings he made. It is undisputed that Cato was a member of the Brotherhood of Carmen at the time of his death. The agreement effective March 1, 1926, was made for his benefit, as well as for the benefit of all others affected by its terms, and that agreement was in force at the time of Cato's death. In the general rules set forth in the agreement, which applied to all the employees who are members of the crafts, who entered into the agreement, Rule 55 plainly said: 'No employee will be required to work under a locomotive or car without being protected by proper signals.' Rule 158, contained in the 'Special Rules as to Carmen,' is not inconsistent with Rule 55 of the general rules. On the contrary, the two rules are in absolute harmony. Rule 158 provides: 'Trains or cars, while being inspected or worked on by train-yard men,

will be protected by a blue flag by day and a blue light by night. * * *' The General Rule (55) is an agreement on the part of the railroad companies that they will protect an employee working under a locomotive or car by proper signals. Rule 158 only goes farther and states that the railroad companies will protect trains or cars, while being worked on by train-yard men, with certain kinds of signals, namely, a blue flag by day and a blue light by night. The old Blue Flag Rule, No. 26, contained in the book of rules of Southern Railway System, may apply, under certain circumstances, to certain employees of that railroad system. They did not apply, however, to the employees affected by the later agreement, effective March 1, 1926. The last agreement, effective March 1, 1926, by Rule 175, the miscellaneous rule, expressly provided that that agreement superseded and cancelled all previous agreements and understandings. And we think that it was clearly the intention of the parties to the agreement, effective March 1, 1926, so far as members of the crafts, who were parties to that agreement are concerned, to change the Blue Flag Rule. It is very significant to our minds that the language of the old rule, 'Workmen will place the blue signals, and the same workmen are alone authorized to move them,' was left out of Rule 158 of the last agreement. Neither can we agree with the appellants that Cato was bound to observe the old 'Blue Flag Rule' because of the statement made in his written application for employment. The agreement made by Cato in that paper was that he would obey the rules governing employees. Until the Blue Flag Rule was changed for the protection of carmen, it was Cato's duty to obey it. After the rule was changed, however, it was his duty not to obey a rule which had been revoked or modified, but to obey the new rule.

"We are unable to agree with the position which it appears that the appellants take in their argument, that the case of *Owens v. A. C. L. Co.*, 141 S. C., 359, 139 S. E., 779, conflicts with the rulings of the presiding Judge, now under

consideration, as to the effect of the 'Blue Flag Rule,' Rule 26 of the Southern Railway System. The injuries to, and the death of Owens, because of which the suit last mentioned was instituted, occurred on March 16, 1923, which was prior to the last agreement involved in this case, effective March 1, 1926. That agreement was not involved in the *Owens case.*"

Appellants claim that Sections 55 and 158 were in effect in the same language in the working agreement effective December 27, 1921, as in the agreement effective March 1, 1926, and subsequent to the agreement of 1921, Rule No. 26 was reissued on August 1, 1923.

Rule No. 26 seems to have been first adopted November 15, 1899, and last adopted August 1, 1923. The agreement incorporating Paragraphs 55 and 158 was first adopted December 27, 1921. Then by this working agreement of date December 27, 1921, so far as members of the crafts who were parties to that agreement are concerned, Rule No. 26 was abolished, and even if it was readopted by the railway company in the face of that agreement on August 1, 1923, it was again abolished by the agreement of March 1, 1926, under which Cato was working at the time of his death. But Rule No. 26 was readopted to apply to everyone except those of the crafts mentioned in the agreement. Rule No. 26 is a valid rule today to all employees except those mentioned in the agreement.

Appellants complain that Rule 158 is ambiguous, and for this reason parol testimony should be received to explain its meaning. This question was decided against the appellants by the decision of the last appeal, where they raised the same question by their ninth exception, where they complained: "Because the Judge, in striking out and dismissing from the consideration of the jury the testimony of witnesses R. W. Watson and P. P. Manning, to the effect that it was the duty of O. C. Cato, under Paragraph 158 of the agreement, to place the blue flag signal required, etc." As to this excep-

tion, our Court said: "It is our opinion that the Judge was correct as to the holdings he made."

Our Court has already decided that Paragraphs 55 and 158 are not ambiguous, and that the presiding Judge in the first appeal was correct in holding that testimony should not have been permitted to prove whose duty it was to place the blue flag, because these two paragraphs plainly place that duty upon the railway company.

Did the presiding Judge err in holding that while the railway company, under the said agreement, could not delegate to another the duty of posting the blue flag, it could not delegate such duty to deceased, O. C. Cato? Exceptions 6 and 23.

The agreement would have been futile and useless if the law would permit the railway company to disregard it by delegating the very man who was to be protected to perform the duty which he was to be relieved of by the adoption of the agreement. The agreement was made for the purpose of *furnishing* protection to the car repairmen while working on or underneath cars, not merely for the railway company to pass a rule to say to the repairman that he must protect himself. The agreement provided that the railway company was to protect the repairmen. And if the railway company had delegated the duty to the repairman himself, the contract would have been violated and nullified. *Sturdyvin v. Railway Company*, 98 S. C., 125, 82 S. E., 275, 277.

Did the presiding Judge err in refusing appellants' twenty-first and twenty-second requests to charge to the effect that under the evidence as to custom and practice it was for the jury to say whether it was incumbent on the deceased to place the blue flag? Exceptions 16, 20, 21, and 22.

The testimony produced by the appellants as to custom and practice in regard to the placing of the blue flag was objected to by the respondent. In our opinion, the testimony was incompetent because evidence of custom and usage is not permissible to explain or vary the terms

of an express contract, whether written or verbal, unambiguous in its terms. *Coates v. Early,* 46 S. C., 220, 24 S. E., 305; *Fairly v. Wappoo Mills,* 44 S. C., 227, 22 S. E., 108, 29 L. R. A., 215; *Alexas v. Post & Flagg,* 129 S. C., 53, 123 S. E., 769, 35 A. L. R., 969; *Martin v. Telegraph Co.,* 81 S. C., 432, 62 S. E., 833; *Thomas v. Graves,* 1 Mill, Const., 308; *Patton v. Magrath,* Dud., 159, 31 Am. Dec., 552; *Hayward v. Middleton,* 3 McCord, 121, 15 Am. Dec., 615.

In the case of *Paster v. Pennsylvania Railway* (C. C. A.), 43 F. (2d), 908, cited by appellants, the Court was construing a rule of the company and not a contract. All the cases cited by appellants on this point apply to rules of the company, and not to contracts made with the employees for their protection.

This case is authority for respondent and not for appellants in this case. The Court did not consider the blue flag rule for the reason as stated: The signals were not available and the job was an emergency one. "The rule provides for that possibility and the real question is as to the words 'protection must be given to those engaged in making repairs.' " The Court allowed the practice of the company and its employees to be proved as to what instruments were employed to gain such protection, the rule not being specific in that particular. In the instant case, the rule is specific and the instrumentalities are named, to wit, a blue flag by day and a blue light by night.

It is admitted by all the witnesses for appellants that no such protection was given; on the contrary, that the general rule required the workmen to place the flags and not the company.

The appellants undertook to show that the foreman of the yard had instructed his men that it was their duty to place these signals under penalty, as the workmen testified, of losing their lives or being discharged from the service, the foreman swearing, 'losing their lives or being severely rep-

rimanded," thus making this attempt fall squarely under the rule laid down by this Court in *Sturdyvin v. Railway Company, supra.* This Court observed: "Doing the work in the customary way was a condition of remaining in the service. Under such circumstances, the existence of the rule suggests the possibility of its having been made and promulgated for purposes other than the real desire to safeguard the defendant's employees. Under such circumstances, a rule should not be an effective shield from liability." *Citing Bussey v. Railway Company,* 78 S. C., 356, 58 S. E., 1015.

We do not find any reversible error in the trial below complained of in the exceptions of the appellants.

While we have read with interest the views expressed in the dissenting opinion, we are not moved by them to alter the conclusions reached by us heretofore. Perhaps, however, they require some notice. It might appear more systematic and orderly to revise our opinion on account of the dissenting opinion, but, for the reasons here given, we shall undertake a review of it in this easier, but more lengthy, way. The intestate, Cato, was killed on November 6, 1926. This case, brought by the administratrix of his estate, was not heard in the Court of Common Pleas for Spartanburg County until May, 1928. The appeal from the judgment in favor of the administratrix was not heard in this Court until the October, 1929, term. On account of its importance, the case received much attention from all the members of the Court, and our decision was not handed down until March 15, 1930, 155 S. C., 304, 152 S. E., 522. The second trial in the lower Court was had at the May, 1930, term. A second judgment in favor of the administratrix-respondent was recovered, and the railroad companies appealed therefrom to this Court. We heard the appeal at the January, 1931, term. It will be seen, therefore, that it has been four and one-half years since Cato was killed while in the employ of the appellants. It is not our wish to delay this decision longer than it is absolutely necessary, and, in order to prevent as much de-

lay as possible, we notice in this manner the proposed holdings of the dissenting opinion.

It is proposed in the dissenting opinion that we hold that the motion of the appellants for a directed verdict in their favor should have been granted, and that the case be reversed and remanded to the lower Court for the entry of a judgment in their favor. This.in face of the former *unanimous* holding of this Court "that the evidence was entirely sufficient to require a submission of the issues to the jury for determination as to the first cause of action. (That cause of action was brought under the provisions of the statutes of this State—not under the Federal Employers' Liability Act.)" The judgment proposed in the dissenting opinion is in direct opposition to the former *unanimous* judgment of this Court, which was expressed in this language: "It is the judgment of this Court that the judgment below be, and the same is hereby, reversed, and the cause remanded to the Court of Common Pleas of Spartanburg County for a new trial as to the first cause of action, with the right to the respondent to set up again the second cause of action and proceed to trial thereon, if she shall be so advised."

To sustain the general conclusion proposed in the dissenting opinion, these positions, in brief, are taken: (1) That the holding in the former opinion "that certain paragraphs of the agreement between the Railroad Company and the Brotherhood of Railway Carmen, imposed upon the Railroad Company the duty of protecting the car upon which the intestate was at work, by the placing of a blue flag" should not now be regarded as the *law of the case* and accepted at this time without question; (2) that the judgment rendered by this Court upon the former appeal was not a final judgment; it was in the nature of an interlocutory judgment, reversing the judgment of the Circuit Court and remanding the case to that Court for a new trial; and (3) that this Court "went out of its way to hold that the agreement of 1926, by Paragraphs 55, 158 and 175, superseded Rule 26

of the Railway Company, relating to protection by blue flag."

In discussing "the principle, or policy rather, of what is known as the *law of the case,*" we shall not go to the trouble to review the numerous decisions of Courts of jurisdictions other than our own, quoted from in the dissenting opinion. The law on this subject is well settled by the decisions of our own Court, to a few of which, including the two mentioned in the dissenting opinion, we shall refer.

We accept, as properly declaring the principles of *res adjudicata* or "the law of the case," the declarations of Mr. Justice McGowan for this Court in *Warren v. Raymond,* 17 S. C., 163, quoted in the dissenting opinion, but we suggest that the first sentence of the paragraph from which the quotation came should appear along with the other parts of the quotation. That sentence was this: "The first general question is as to what was decided by the former judgment, *for we cannot reconsider what was there decided.*" (Emphasis added.) We hope to follow, as we think we have already done, the very clear and concise statement of Mr. Justice McGowan, that we cannot here reconsider what we decided in the first appeal.

The case of *Dwyer v. Metropolitan Life Insurance Co.,* 139 S. C., 377, 137 S. E., 347, cited in the dissenting opinion, sustains our view of the law of the case, and follows the decision in *Warren v. Raymond.* In the *Dwyer case,* this Court, with Mr. Justice Cothran writing the opinion, reviewed the decision of the Court in the second appeal in that case (135 S. C., 303, 133 S. E., 547), also written by him. In that second appeal, Mr. Justice Cothran undertook to lay down a certain formula for the calculation of the amount due the insured on certain benefits under an insurance policy. The Circuit Court followed that formula. In the third appeal (139 S. C., 377, 137 S. E., 347, 348), the question of the correctness of the formula came up. It appeared, and the Court conceded in its opinion, that the first formula of Mr.

Justice Cothran was incorrect. The respondent, the insured, insisted, however, that it had to be recognized and followed. In disposing of that question, Mr. Justice Cothran said this: "The respondent takes the position that the conclusions of the Court in reference to the formula adopted is *res adjudicata,* and cannot now be inquired into. As to this position the Court is of opinion that the statement in the former opinion setting forth the formula above referred to was not involved in the case, and must therefore be considered *obiter dictum.*"

Attention was also called in the opinion to the fact that in the second appeal "the sole question for determination was the propriety of the proposed amendment submitted by the plaintiff." It is to be. noted, therefore, that the *Dwyer case,* depended upon in the dissenting opinion as to the question of *res judicata,* decided positively two things: (1) That the sole question in the former opinion was one as to an amendment; and (2) that the formula was *obiter dictum.*

In that same *Dwyer case,* we find something else as to the law of the case. In the first trial of the case, the plaintiff had a judgment against the insurance company, and the company appealed, and the case was sent back for a new trial. After the case was remanded to the lower Court, the plaintiff sought to amend her complaint, and when her motion therefor was refused she appealed to this Court. One of the same questions involved in the first appeal (132 S. C., 10, 129 S. E., 84), came up again in the second appeal (135 S. C., 303, 133 S. E., 547, 548). Speaking for this Court, Mr. Justice Cothran there said: "Whether intentionally or not, and whether correctly or not, the effect of this holding is to eliminate the defense of the company that, after the expiration of the period for the exercise of the options provided, the insured had accepted $34.54 in full settlement of the cash surrender value of the policy and had surrendered it for cancellation; and to confine the defendant to its rights and subject it to the obligations under the second option, which were to the insured a reduced amount of nonparticipating

paid-up insurance. It means that, after the time for the exercise of the options had expired, the second option automatically went into effect, and the insured and the company had no right by agreement to change that situation. Whether the beneficiary had such rights in the lapsed policy as to demand this construction is not now open to question; it has become the law of the case."

It is to be observed that, in the decision of the *Dwyer case* last referred to, although there was some little intimation that the former decision of the Court had been wrong and may have deprived the insured of her legal rights, yet it was held that the former decision was *the law of the case, intentionally or not, and correctly or not*. It is to be observed also in that case, where there had been a remand to the lower Court and direction for a new trial, at the instance of the insurance company, and where the former decision was absolutely decided to be the law of the case, not a single thing was said to indicate that this Court, or the writer of its opinion, regarded the judgment rendered on the first appeal as anything else except a final judgment, and there was not the slightest suggestion that the judgment rendered was "in the nature of an interlocutory judgment."

In *Richardson v. N. W. Railroad Company,* 131 S. C., 57, 126 S. E., 397, 399, this Court, speaking through the late Mr. Justice Fraser, whose declaration was concurred in by Justices Watts and Cothran, said this: "When a new trial is ordered, *the opinions of the appellate Court declare the law that governs the case."* (Emphasis added.) Not a thing was said in that opinion as to the former judgment of the Court being only an interlocutory judgment.

In *Sandel v. State,* 140 S. C., 51, 133 S. E., 709, this Court, in very short order, disposed of an appeal, and there Mr. Justice Cothran said: "The exceptions raise only questions which have already been raised, considered, and decided by the Court *en banc,* and are *res adjudicata."* Although the judgment of the lower Court had been reversed on the

former appeal (126 S. C., 1, 119 S. E., 776), and the case had been remanded for a new trial, not a thing was said in the last opinion of the Court about the former judgment being only an interlocutory judgment.

In *Cayce Land Company v. Guignard et al.,* 140 S. C., 497, 139 S. E., 145, with Mr. Justice Cothran speaking for a unanimous Court, we held that the opinion on the former appeal in the case was conclusive, after remand for further proceedings not inconsistent with the conclusions reached in the first opinion.

The most important of all our cases touching "the law of the case" is the recent one of *Jenkins v. Southern Railway et al.,* 145 S. C., 161, 143 S. E., 13, 14. It is important not only for the reason that it is a very recent decision, but for the further and more important fact that it went into only one question, *the law of the case*; so, having not discussed anything except that one question, it cannot be contended, with any degree of correctness, that anything said therein was *obiter.* The history of the case, for the purposes here necessary, briefly stated, is as follows: Jenkins sued the Southern Railway Company and an agent of that company for an alleged slander. The action in the Circuit Court resulted in a judgment in favor of the plaintiff for punitive damages against the agent for $150.00 and against the railway company for $2,000.00. Both defendants appealed to this Court, where the judgment below was reversed, and the case remanded to the lower Court for a new trial. 130 S. C., 180, 125 S. E., 912. The ground of the reversal was that punitive damages could not be apportioned, as had been done in the jury's verdict. The case remained on the docket of the Court of Common Pleas of Barnwell County without having been again tried. Meanwhile, in the case of *Johnson v. Railroad Company et al.,* 142 S. C., 125, 140 S. E., 443, this Court expressly overruled the holding mentioned in the *Jenkins case,* and held that punitive damages in such cases could be apportioned. The plaintiff in the *Jenkins case,* look-

ing forward to another trial of his cause and realizing that when he went back into Circuit Court in that trial he would be tied down by the former decision of this Court in his case by "the law of the case," came back to this Court seeking the relief he felt himself entitled to have. He asked this Court to declare that he was not bound by the former decision of this case, because this Court had in the meantime held that its former decision was wrong. In a very able opinion, this Court, with Justice Cothran speaking for it, decided against the contention of Jenkins. In the opinion, the following language from 2 R. C. L., 223, was quoted with approval: "It may be stated generally, that a Court of review is precluded from agitating questions which were propounded, considered, and decided in a previous review; the decisions agree that, as a general rule, when an appellate Court passes upon a question and remands the cause for further proceedings, the question then settled becomes the 'law of the case' upon a subsequent appeal, and the only mode of reviewing the decision in the prior appeal is by a motion for a rehearing."

Using his own words, Mr. Justice Cothran, for this Court, said: *"The decision of the Court upon the appeal referred to is not only res adjudicata as between the parties, but is the 'law of the case,' right or wrong."* (Emphasis added.)

Not a thing was said in the opinion about the former judgment being of an interlocutory nature. Jenkins, in his suit against the railroad company, was bound by law, decided on the railroad company's first appeal against the interest of Jenkins, although this Court had afterwards expressly declared *that law to be bad*.

To sustain the conclusion reached by Mr. Justice Cothran and concurred in by all the members of the Court who participated therein, there were cited the following South Carolina cases: *Jones v. Railway Co.,* 65 S. C., 410, 43 S. E., 884; *Forrest v. McBee,* 78 S. C., 105, 58 S. E., 955; *Brown v. Telegraph Co.,* 92 S. C., 354, 75 S. E., 542; *Halsnall v.*

*Railroad Co.,* 100 S. C., 483, 85 S. E., 433; and *Earle v. City,* 84 S. C., 193, 65 S. E., 1050. We are still of the opinion that all those cases *did sustain* the conclusion reached in the *Jenkins case.* Since not one of them is referred to in the dissenting opinion, we deem it unnecessary to enter into a discussion of what their holdings were.

We cannot agree that this Court, or any one of its five members who participated in the decision, *went out of the way* to hold that the agreement of 1926 superseded Rule 26 of the railway company, relating to protection by the blue flag, which statement is so strongly announced in the dissenting opinion. Under the Constitution of this State (Art. 5, § 8), it is the duty of this Court, when a judgment or decree is reversed or affirmed by it, to consider and decide "every point made and distinctly stated in the cause and fairly arising upon the record of the case." When this Court endeavored faithfully to pass upon and to decide every point made and distinctly stated by the appellants in their first appeal, we hardly see how it can be fairly said by any one that the Court "went out of its way."

In the very excellent brief of appellants' counsel on the first appeal, in setting forth, as required by the rule of the Court, the questions involved in the appeal, they listed the fifth and sixth questions as follows:

"5. Should appellants have been allowed to prove whose duty it was to place the blue flag signals, required at the end of the car, before going to work thereunder?

"6. Did the Presiding Judge err in charging the jury that it was the duty of the railway company and not that of plaintiff's intestate to place the blue flag as required by Paragraph 158 and Rule 26, and in refusing defendants' requests relating thereto?"

Question No. 5 was based, as the counsel stated, on their Exception 9, which was as follows:

"Because the Presiding Judge erred in striking out and dismissing from the consideration of the jury the testimony

of the witnesses, R. W. Watson and P. P. Manning, to the effect that it was the duty of O. C. Cato, under Paragraph 158 of Exhibit 'A,' to place the blue flag signals required at the end of the car before going to work thereunder; the error being that said testimony was competent and relevant to the issues as raised by the pleadings in this case."

The sixth question, according to the argument of counsel for the appellants, was based on Exceptions 13, 14, 15, 17, and 18. It is not necessary to quote all these exceptions; the 13th discloses the gist of all of them.

"Because the Presiding Judge erred in charging the jury that under Paragraph 158 of agreement marked Exhibit 'A,' it was the duty of the railway company to protect the deceased, O. C. Cato, by placing a blue flag at the end of the baggage car before sending him to work thereunder; the error being that this was not the duty of the railway company, but the duty of O. C. Cato himself."

It is true this Court did not, in its opinion on the first appeal, specifically refer to these exceptions by number. In referring to the numerous exceptions made by the appellants, there being nineteen, we called attention to the fact that they raised questions relating to "the refusal to admit certain testimony offered by them (the appellants), the failure to grant their motions for a nonsuit and a directed verdict, the refusal to grant certain of their requests to charge and certain instructions given in the charge." We *unanimously* said: "We shall not undertake to treat these exceptions separately, but we will cover all of them generally."

In discussing the questions raised, we quoted in full every one of the rules referred to in the dissenting opinion as follows:

"Rule 55 of the General Rules is as follows:

" 'Employees required to work under locomotives and cars:

" 'No employee will be required to work under a locomotive or car without being protected by proper signals. Where

the nature of the work to be done requires it, locomotives or cars will be placed over a pit, if available.'

"158. Trains or cars while being inspected or worked on by train-yard men will be protected by a blue flag by day and blue light by night, which will not be removed except by men who place them."

175. "Except as provided for under the special rules of each craft the general rules shall govern in all cases.

"This agreement supersedes and cancels all previous agreements and understandings and constitutes the sole agreement between the company and the employees affected."

In our opinion, we quoted from the charge of the trial Judge as follows: "I charge you as to that section, Mr. Foreman, that the railroad company, under this head of 'Protection for Repairmen,' by that provision agreed that trains or cars while being inspected or worked on by train-yard men will be protected by blue flag by day and blue light by night; and that under this provision it became the duty of the railroad company to see that such protection was afforded by the paragraph."

Discussing the quoted rules, the charge of the Judge, his rulings as to testimony, and the exceptions of the appellants thereabout, we said this: "The old Blue Flag Rule, No. 26, contained in the book of rules of Southern Railway system, may apply, under certain circumstances, to certain employees of that railroad system. They did not apply, however, to the employees affected by the later agreement, effective March 1, 1926. The last agreement, effective March 1, 1926, by Rule 175, the miscellaneous rule, expressly provided that that agreement superseded and canceled all previous agreements and understandings. And we think that it was clearly the intention of the parties to the agreement, effective March 1, 1926, so far as members of the crafts, who were parties to that agreement are concerned, to change the Blue Flag Rule. It is very significant to our minds that the language of the old rule, 'Workmen will place the blue signals and the

same workmen are alone authorized to move them,' was left out of Rule 158 of the last agreement. Neither can we agree with the appellants that Cato was bound to observe the old 'Blue Flag Rule' because of the statement made in his written application for employment. The agreement made by Cato in that paper was that he would obey the rules governing employees. Until the Blue Flag Rule was changed for the protection of carmen, it was Cato's duty to obey it. After the rule was changed, however, it was his duty not to obey a rule which had been revoked or modified, but to obey the new rule."

After the opinion of this Court on the first appeal was handed down, counsel for appellants, railroad companies, filed a petition for rehearing. The first ground on which the rehearing was asked was that in affirming the charge of the presiding Judge, which we quoted above, this Court overlooked the testimony of certain witnesses in the case. The second ground was that our holding to the effect that the agreement, effective March 1, 1926, so far as members of the crafts who were parties to that agreement were concerned, changed the blue flag rule was erroneous; that the Court had misapprehended the meaning of Paragraphs 55, 158, and 175 of that agreement, and as a result of our holding we had "deprived appellants of any defense to this action."

The grounds stated in the petition for rehearing show that appellants' counsel were fully aware that our holdings as to the blue flag rule were properly involved in the appeal, and that our holdings thereabout had become, and on the second trial of the case would be, "the law of the case." That petition for rehearing, without any comment on the part of the Court, or any member of it, was *unanimously dismissed.*

The language of Mr. Justice McGowan in *Warren v. Raymond, supra,* emphasized so strongly in the dissenting opinion, is this: *"The principle is that the decision of a Court of competent jurisdiction upon a point which was considered*

*or should have been considered as necessarily involved, is final and conclusive."* Measured by the standard there laid down, the former decision of this Court as to the effect of the later agreement on the Blue Flag Rule was *final and conclusive.* This Court was one of competent jurisdiction to pass upon the point raised by the appellants in their appeal. The Court did consider that question, and it was *necessarily involved* in the appeal—the appellants made the necessity. The case of *Jenkins v. Southern Railway Co.,* 145 S. C., 161, 143 S. E., 13, from which we have heretofore quoted, is absolutely in line with the decision in *Warren v. Raymond, supra.* There is only one distinction, too, to be noted between that case and the case at bar. That distinction is this: In the *Jenkins case* the law of the case was favorable to the Railroad Company, while in this case the law of the case is against the Railroad Company. This Court, of course, as "administrators of the law," have a "passion for the justice and righteousness of a pending issue." And if we have heretofore committed error against the Railroad Companies, and our "technical rule" has the effect "to deprive one of its property," we are, of course, regretful: but, as Mr. Justice Cothran said in the *Jenkins case,* where our judgment was favorable to the Railroad Company, *"The decision of the Court upon the appeal referred to is not only res adjudicata as between the parties, but is the 'law of the case,' right or wrong."*

We do not concede, however, that our former opinion was erroneous. We still think it was right. The railroad companies made the agreement with the crafts; they had the agreement printed and distributed among the employees working for them. If the intention was not to change the blue flag rule, so far as the members of the crafts were concerned, the railroad companies were responsible for the unfortunate manner in which they allowed the matter to be handled.

"When this Court directed 'that the case be remanded * * * for a new trial,' and the remittitur went down, this Court lost jurisdiction in the case, and it stood for a new trial in the Circuit Court between the plaintiffs and the railway company. Whatever error may have been committed by this Court, if any was committed * * * could not be corrected. *Carpenter v. Lewis,* 65 S. C., 400, 43 S. E., 881; *Forrest v. McBee,* 78 S. C., 105, 58 S. E., 955." *Durst v. Southern Railway Co.,* 161 S. C., 498, 159 S. E., 844, 849, filed April 14th, 1931.

This Court on the first appeal *unanimously* laid down the law to govern the case on the second trial. The Circuit Judge there, in making his rulings, could do naught else than follow the plain declarations of this Court as to the law involved in the cause. The attorneys in the case were bound to follow what we had said was the law, and counsel for the appellants so conceded on their petition for rehearing. It would now be unfair to the trial Judge and the lawyers, and more than all, it would be unfair to Cato's widow and children, for this Court, after having put them to the suspense and anxiety of another trial in the Court of Common Pleas, to say to them that we should have thrown you out of Court on the first trial, and because we committed an error at that time you now have no standing in this Court. The policy of the law of the case has been invoked through many, many years just to prevent appellate Courts from allowing such occurrences to happen.

It is vigorously asserted in the dissenting opinion that *all the evidence showed without doubt* that Cato knew that it was his duty to place the blue flag before he went to his honest work under the baggage car, engaged in intrastate commerce. Some of the testimony has been overlooked. Mr. C. M. Senn, a witness in the case and an employee of the railroad companies, one of the first men to reach Cato after he had been injured and mangled, testified he heard the dying man say to the foreman, who had come to the place of

the accident, *"Why did you send me out here where there was no protection?"* The words of the dying Cato show more strongly than any other evidence in the whole case that Cato not only thought and believed, but that he *knew* that it was the duty of the railroad company to protect his life and limb while he was under that baggage car by placing the blue flags at the ends of the car.

In our first decision, passing upon the numerous exceptions of the appellant for failure of the trial Judge to grant their motions for a nonsuit and directed verdict, and with especial regard to those motions as to the first cause of action brought under the State law (not under the Federal Employers' Liability Act), we *unanimously* said: *"If there was any evidence at all to show that the deceased, Cato, was engaged in interstate commerce at the time he received his injuries, that resulted in his death, it was certainly scant."* *The baggage car, not fit for use and not shown to have recently been in any kind of use, was found at a point within the State of South Carolina. It was carried from that point to another point within the State of South Carolina; on its journey between these two points, it was at no moment without the limits of the State of South Carolina; completing its journey, it was left at a point in South Carolina for repairs, and within the State of South Carolina, while it was being repaired, Cato, one of the men repairing it, was killed.* The first jury who tried the case said that Cato was engaged in intrastate commerce. The presiding Judge at that time approved that finding. The jury who last heard the case said that Cato was engaged in intrastate commerce. The Circuit Judge there presiding approved that finding. Two juries and two presiding Judges have approved the first declaration of this Court. An examination of the record convinces us more than ever, that our former declaration and the findings of the jury, approved by the Circuit Judges, *that the evidence attempting to show that the baggage car was engaged in interstate commerce was scant,* was correct.

The judgment of this Court is that the judgment of the Court of Common Pleas of Spartanburg County be, and the same is hereby, affirmed.

MR. JUSTICE STABLER and MR. ACTING ASSOCIATE JUSTICE COSGROVE concur.

MR. JUSTICE CARTER concurs in result.

MR. JUSTICE COTHRAN (dissenting) : In my opinion, the motion of the defendants for a directed verdict in their favor should have been granted; the judgment of the Circuit Court should therefore be reversed, and the case remanded to that Court for the entry of judgment in favor of the defendants under Rule 27.

The undisputed facts of the case, summarized, are substantially as follows:

The plaintiff's intestate, O. C. Cato, on December 6, 1929, was employed by the defendant Southern Railway Company as a car repairer in the railroad yard at Hayne, near Spartanburg (the *Hayne yard* must not be confused with the *Hayne shops,* which were a mile and a half away). On December 4th, two days before the accident, a freight train from Columbia had placed and left upon track No. 10 (a switch track, not a repair track), a string of 52 cars, including a baggage car in bad order; the cars were all coupled together, the baggage car occupying the extreme west end of the string of 52 cars; the baggage car was destined to *Hayne shops* for repairs, as were also other cars in the string; a number of the cars were interstate cars, some of which were destined to the shops for repairs and others in good order were to be placed in trains to be made up and transported to their foreign destinations; the bad order cars, domestic and foreign, destined to the shops for repairs, were to be moved by a shops engine, entering track 10 at the west end.

It was discovered that the baggage car was in such bad order that it could not be moved to the shops until certain repairs had been made upon it as it stood on track No. 10, at the extreme west end, necessarily obstructing the move-

ment of the bad order domestic and foreign cars and the good order foreign cars; the intestate, as a car repairer, was directed to make the necessary repairs on the baggage car, and went under the car for that purpose, omitting the precaution of placing a blue flag at the other end of the string for his protection; while he was so engaged, an engine entered the east end of track 10 for the purpose either of adding cars to the string or of moving certain ones (there being no signal indicating that workmen were under the car), coupled to and pushed the string of 52 cars to which the baggage car was attached, caught the intestate under the baggage car and so crushed him that he died later in the day.

I. Upon the former appeal in this case, the result of which was the reversal of a judgment in favor of the plaintiff and an order for a new trial, it was held in the opinion that certain paragraphs of the agreement between the railroad company and the Brotherhood of Railway Carmen, imposed upon the railroad company the duty of protecting the car upon which the intestate was at work, by the placing of a blue flag; and in the opinion submitted by the Chief Justice, it is proposed to be held that the principle, or policy rather, of what is known as the *law of the case,* compels the Court, upon this appeal, to accept without question the ruling upon the former appeal. I do not think that this at all necessarily follows. It must be borne in mind that the judgment rendered by this Court upon the former appeal was not a final judgment; it was in the nature of an interlocutory judgment, reversing the judgment of the Circuit Court and remanding the case to that Court *for a new trial;* it must be remembered, too, that the judgment of this Court was based upon adjudicated error in one single particular, the exclusion of testimony tending to show that there was a typographical error in Paragraph 157 of the agreement, which read as follows:

"Protection for Repairmen: Switches *or* repair tracks will be kept locked with special locks and men working on such

tracks shall be notified before any switching is done. A competent person shall be regularly assigned to perform this duty and held responsible for seeing it is performed properly;" the contention of the defendants being that the italicized word "or" should have been "of." The Court held that testimony offered by the defendants tending to show that their contention was correct should have been received; else that the word "or" appearing "in the rule in place of the word 'of' which was the correct word, had the effect of making Rule 157 not only ambiguous, but absurd and nonsensical."

That was the sole point upon which the judgment was reversed; upon the new trial ordered, the plaintiff specifically withdrew and abandoned reliance upon Rule 157. All that was decided, necessary to sustain the judgment of reversal, was the admissibility of testimony tending to establish the fact of a typographical error. In deciding that issue, the Court recognized the rule which is intensely applicable to the present issues: "It is a familiar canon of construction that, if contract is doubtful in meaning, the Court may look into the construction which the parties themselves have placed on it, to reach the true intention, which is the object of all judicial interpretation." (Syllabus) *McGregor v. Hurst,* 140 S. C., 464, 138 S. E., 865.

It is true that in overruling certain exceptions of the defendants the Court, as I think, went out of its way to hold that the agreement of 1926, by Paragraphs 55, 158, and 175, superseded Rule 26 of the railway company, relating to protection by blue flag, and that the duty imposed by the last-named rule was no longer binding, but that that duty was imposed upon and assumed by the railway company.

The rule crystallized under the description of "the law of the case," is not like that of *res adjudicata,* a rule of substantive law, but is a rule of policy, enforceable in the interest of justice and judicial repose. It will not be enforced to perpetrate or perpetuate a judicial error unless it appears that the declared law was necessary to the rendition of the

judgment. I concede that if it is shown to have been, the party against whose interest the declaration was made will be estopped from questioning it in a subsequent proceeding of the same case, notwithstanding it may later appear that the declaration was glaringly incorrect. If, however, the declaration may be shown to have been so incorrect, the Court should not follow it except under judicial compulsion; it will not, upon a side issue, employ the technical rule to deprive one of his property. The administrators of the law should, with a passion for the justice and righteousness of a pending issue, not feel themselves bound to follow an error except under the clearest and most imperative circumstances.

In discussing the much more rigid doctrine of *res adjudicata,* the Court, in *Warren v. Raymond,* 17 S. C., 163, said: "The principle of *res adjudicata* is one of the most important in the administration of justice; for the peace and order of society require that there should be an end of litigation. As was said by a distinguished English Judge: 'Human life is not long enough to allow matters once disposed of being brought under discussion again; and for this reason it has always been considered a fundamental rule that when a matter has once become *res adjudicata,* there shall be an end of all question about it.' *The principle is that the decision of a Court of competent jurisdiction upon a point which was considered or should have been considered as necessarily involved, is final and conclusive."* (Emphasis added.)

In 4 C. J., 1093, it is said: "It is a rule of general application that the decision of an appellate Court in a case is the law of that case on the points presented throughout all the subsequent proceedings in the case in both the trial and the appellate Courts, and no question *necessarily involved* and decided on that appeal will be considered on a second appeal or writ of error in the same case, provided the facts and issues are substantially the same as those on which the first decision rested, and, according to some authorities, provided the decision is on the merits."

At page 1105: "Questions *necessarily involved* in the decision on a former appeal will be regarded as the law of the case on a subsequent appeal, although the questions are not expressly treated in the opinion of the Court, as the presumption is that all the facts in the case bearing on the points decided have received due consideration whether all or none of them are mentioned in the opinion. The records on a former appeal may be looked into for the purpose of ascertaining what facts and questions were then before the Court, so as to see to the correct application of the rule; and where the first judgment is a general reversal and remanding, on the second appeal the Court may look at the opinion rendered previously to ascertain *the real ground of decision.*"

. In *Thompson v. Maxwell*, 168 U. S., 451, 18 S. Ct., 121, 123, 42 L. Ed., 539, the Court said: "We take judicial notice of our own opinions, and, although the judgment and the mandate express the decision of the Court, yet we may properly examine the opinion in order to determine what matters were considered, *upon what grounds the judgment was entered* and what has become settled for further disposition of the case."

In *Kempner v. Huddleston*, 90 Tex., 182, 37 S. W., 1066, it was held, quoting syllabus: "Whether the appellate Court will reconsider, on a second appeal, what it has formerly decided in the same case, is a question addressed to the discretion of the Court, and to be determined according to the particular circumstances of such case; and hence a decision of a question on appeal is not a bar to a consideration of the same question on a second or other subsequent appeal of the same case." The opinion declares: "To the first question propounded we answer that the former decision of the Court in this case constitutes no bar to the further consideration of the same question upon a second appeal. *Burns v. Ledbetter*, 56 Tex., 282; *Railway Co. v. Faber*, 77 Tex., 153, 8 S. W., 64; *Bomar v. Parker*, 68 Tex., 435, 4 S. W., 599. In *Railway Co. v. Faber*, cited above, the Court said:

'Upon a second or other subsequent appeal this Court adheres to the former rulings, unless clearly erroneous.' The question as to whether the Court will reconsider, upon a second appeal, what it has formerly decided in the same case, must always be addressed to the discretion of the Court, and determined according to the particular circumstances of that case."

In *Messinger v. Anderson*, 225 U. S., 436, 32 S. Ct., 739, 740, 56 L. Ed., 1152, the Court said: "In the absence of statute the phrase 'law of the case,' as applied to the effect of previous orders on the later action of the Court rendering them in the same case, merely expresses the practice of Courts generally to refuse to reopen what has been decided, *not a limit to their power."*

In *Gamble v. Keyes*, 49 S. D., 39, 206 N. W., 477, it was held, quoting syllabus: "An earlier decision of Supreme Court in a case is conclusive on subsequent trials, but, although recognized as law of the case, it is not conclusive on subsequent appeals, if palpably erroneous, and may be corrected on urgent reasons."

In *Illinois Cent. R. Co. v. Crail* (C. C. A.), 31 F. (2d), 111 (reversed upon another point in 281 U. S., 57, 50 S. Ct., 180, 74 L. Ed., 699, 67 A. L. R., 1423), the Court said: "While it is within the power of the Courts to disregard the rule of 'law of the case' in the interest of justice, it is the general practice of Courts to refuse 'to reopen what has been decided.' "

In *Reed v. Association* (Mo. App.), 33 S. W. (2d), 986, 988, the Court said: "This general rule is subject to the limitation, however, that the former decision may be reconsidered under exceptional circumstances, as where the opinion was out of harmony with other decisions; where incorrect principles of law were inadvertently declared; where mistake of fact was made; or where injustice to the rights of the parties would be done by an adherence to the first opinion. *Murphy v. Barron*, 286 Mo., 390, 228 S. W., 492;

*Mangold v. Bacon,* 237 Mo., 496, 141 S. W., 650; *Davidson v. St. Louis S. F. Ry. Co.* [301 Mo., 79, 256 S. W., 169], *supra; Seibert v. Harden,* 319 Mo., 1105, 8 S. W. (2d), 905; *Hogan v. Kansas City Public Service Co.* [322 Mo., 1103], 19 S. W. (2d), 707, 65 A. L. R., 129; *Wair v. American Car & Foundry Co.* [(Mo. App.), 300 S. W., 1048], *supra."*

In *Elmore County v. Tallapoosa County,* 222 Ala., 147, 131 So., 552, 554, the Court said: "The former decision is not decisive of the second appeal in the same case between the same parties if this Court is impressed with a contrary view. *Louisville & Nashville R. R. Co. v. Western Union Tel. Co.,* 195 Ala., 124, 126, 71 So., 118, Ann. Cas., 1917-B, 696; *Louisville & Nashville R. R. Co. v. Abernathy,* 197 Ala., 512, 534, 73 So., 103."

In *Miller Cattle Co. v. Francis* (Ariz.), 298 P., 631, 632, the Court said: "Whatever was said in our former opinion, *if necessary to a decision of the questions before us,* has become the law of the case and should be strictly adhered to in all further proceedings in the case."

In *Hogan v. Kansas City Co.,* 322 Mo., 1103, 19 S. W. (2d), 707, 65 A. L. R., 129, it was held, quoting syllabus: "The Court is not bound by the doctrine of *stare decisis* to adhere to a ruling upon a former appeal, where failure to correct the error would inflict serious injustice, and an important legal question is involved."

In *Murphy v. Barron,* 286 Mo., 390, 228 S. W., 492, it was held, quoting syllabus: "While the general rule is that matters decided on one appeal will not be considered on second appeal in the same case, the decision on the original appeal is not *res judicata* in the full sense, and in exceptional circumstances may be reviewed."

In *Brewer v. Browning,* 115 Miss., 358, 76 So., 267, 519, L. R. A., 1918-F, 1185, Ann. Cas., 1918-B, 1913, it was held, quoting syllabus: "The principle of *res judicata* does not prevent an appellate Court from changing its ruling on

a second appeal, although former Judges have adhered to the rule of the law of the case."

In the opinion it is stated, referring to the rule of the "law of the case" : "We do not think, however, that this rule is so fixed and binding upon the Court that it may not depart from its former decision on a subsequent appeal if the former decision, in its judgment, after mature consideration, is erroneous and wrongful and would lead to unjust results." See, also, *Mangold v. Bacon,* 237 Mo., 496, 141 S. W., 650.

In *Chase v. United States* (C. C. A.), 261 F., 833, it was held, quoting syllabus : "An appellate Court by its decision does not preclude itself from doing justice between the parties, if on a subsequent appeal it should be convinced that its former decision was erroneous."

In the opinion, the Court said : "The appellate Court by such former decision did not preclude itself from doing justice between the parties, if it should be convinced that its former decision was erroneous. *Messinger v. Anderson,* 225 U. S., 436, 444, 32 S. Ct., 739, 56 L. Ed., 1152, 1156; *Lewers & Cooke v. Atcherly,* 222 U. S., 285, 295, 32 S. Ct., 94, 56 L. Ed., 202, 205, 206; *Hertz v. Woodman,* 218 U. S., 205, 30 S. Ct., 621, 54 L. Ed., 1001."

In *Lewers v. Atcherly,* 222 U. S., 285, 32 S. Ct., 94, 95, 56 L. Ed., 202, the Court said : "If that case, instead of this, had been prosecuted to final decree, there was nothing in its former action to hinder the Supreme Court from adopting the principle now laid down, even though it thereby should overrule an interlocutory decision previously reached."

In *Johnson v. Cadillac Co.* (C. C. A.), 261 F., 878, 8 A. L. R., 1023, it was held, quoting syllabus : "Notwithstanding the rules as to *stare decisis,* and that a decision of an appellate Court becomes the law of the case on retrial, the Circuit Court of appeals may, where former decision in the same case was clearly erroneous and announced a wrong rule, which might well affect many persons adversely, reverse

its earlier decision on writ of error after retrial; the rule as to the law of the case being largely one of convenience and policy."

In the opinion it is said: "There are other cases, some of them cited below, in which the Courts have declined on a second appeal or writ of error to be bound by a decision rendered upon the first appeal, and have declared that the rule is not inexorable and without exception that a decision on the first appeal is in all cases to be adhered to. *Bomar v. Parker,* 68 Tex., 435, 4 S. W., 599; *Bird v. Sellers,* 122 Mo., 23, 26 S. W., 668; *Chambers v. Smith,* 30 Mo., 156, 158; *Barton v. Thompson,* 56 Iowa, 571, 9 N. W., 899, 41 Am. Rep., 119. * * * [Referring to the rule of the law of the case, the Court said:] But the rule is not an inexorable one, and should not be adhered to in a case in which the Court has committed an error which results in injustice, and at the same time lays down a principle of law for future guidance which is unsound and contrary to the interests of society." See, also, Notes 8 A. L. R., 1033, 1 A. L. R., 1267.

The question appears to me to be concluded by the decision of this Court in the case of *Dwyer v. Ins. Co.,* 139 S. C., 377, 137 S. E., 347, where the Court held that an erroneous decision on appeal was not binding and should be corrected upon a subsequent appeal.

II. The difficulty of demonstrating that the agreement of 1926 did not have the effect of annihilating the blue flag rule of the company is fully appreciated:

Paragraph 55 of the agreement provides: *"Employees required to work under locomotives and cars.*—No employee will be required to work under a locomotive or car without being protected by proper signals. Where the nature of the work to be done requires it, locomotives or cars will be placed over a pit, if available."

Rule 26 of the Company is: "A blue signal displayed at one or both ends of an engine, car or train, indicates that workmen are under or about it; when thus protected, it must

not be coupled to or moved. Workmen will place the blue signals, and the same workmen are alone authorized to remove them. Other cars must not be placed on the same track so as to intercept the view of the blue signals, without first notifying the workmen."

A proper construction of the agreement, in connection with the evidence held inadmissible by the trial Court, requires the rule of the railway company, in reference to the blue flag, to be read in connection with the agreement, and to impose upon the workmen engaged in repairing a car upon the switch track the duty of placing the protecting flag.

There is certainly nothing in Paragraph 55 which even tends to indicate that it superseded Rule 26. Its very plain meaning is that the company may not *require* an employee to work under a car without being protected by proper signals, the nature of which and the agencies of protection are covered by Rule 26.

Paragraph 158 of the agreement is: "Trains or cars, while being inspected or worked on by train-yard men, will be protected by a blue flag by day and blue light by night, which will not be removed except by men who place them."

The paragraph certainly contains nothing indicating that the company would supervise the placing of the protecting flag. The indication is strong that the man working or proposing to work under a car must see for his own protection that the blue flag was in position; no one else was permitted to remove it. In fact, the last phrase of the paragraph, "which will not be removed except by the men who place them" (referring to the blue flag or blue light), so far from indicating the imposition of the duty to place the flag or light upon the railroad company, indicates an intimate association with and control of the signals by the workmen whose protection was involved, naturally including both placing and removing. It is unreasonable to assume that the intention of the paragraph was to confide to an independent

agency the removal of the signals, regardless of the position of danger occupied by the workman.

The most that can be said of the Paragraph (158), is that it is ambiguous, in not clearly indicating upon whom is imposed the duty of supplying the necessary protection; one can scarcely imagine a more necessary precaution which either the master or the servant should take under the circumstances. That being so, resort may be had to oral testimony showing the custom of operation, and the construction placed upon the rule by those most interested in its provisions.

The testimony along this line was substantially as follows:

The witness Moore testified that he was a car repairer and always relied upon himself to put up a flag while working under and repairing a car; that he never relied upon anybody else; that he put up a flag at each end of the line for his protection against being crippled or killed or losing his job; that a short time before the intestate was killed during the year 1926, frequent safety meetings were held with Watson, the foreman, which were attended by Cato; that the duty of putting up flags was stressed at those meetings, and that they must be put up by the man who was doing the job; that he had never known anybody else to perform this service; that it had been the universal practice ever since he had been employed and is now; that he warned Cato to be more careful and not go under cars without seeing that a flag was placed; that the men who did the work were designated to take the flags down and to put them up; that that has been the universal rule, without exception, during his service of many years; that there had been no modification of the practice by reason of the agreement of 1926; that the method of putting out the flags was the same after 1926 as it was before, the man doing the work putting them out; that he warned Cato in reference to the flags about two weeks before his death, that he said nothing, made no claim that some one else was expected to do that work. (It will be noted that

the trial Judge allowed this testimony solely upon the issue of punitive damages, an erroneous ruling as I think.) The testimony of C. O. Deal, a car repairer, J. T. Gibbs, a car inspector, R. W. Watson, foreman of car repairers, and all of the other witnesses offered by the defendant is to the same effect; it was the universal and invariable practice, notwithstanding the present contention that the duty was imposed upon the railroad company, that the workman engaged in repairing a car was the only one who was expected to put up the flags and take them down.

The most conclusive evidence of the contemporaneous construction of the paragraph and rule is a letter from Watson, the foreman of car repairers, quoting a paragraph from the letter of W. W. Dyke, general chairman of carmen, dated April 1, 1926, after the agreement of March 1, 1926, became effective, as follows, addressed to car inspectors and repair men: "I wish to impress upon your minds *the necessity of protecting yourselves* with blue flags by day and blue lights by night. Not only do I stress the importance of this for the sake of saving lives, but also for your jobs, which you are about to sacrifice *when you disregard the rules which should govern you,* I am going to ask the local officers and members at each point to see that this is done. * * * (Impressing upon the parties addressed the existence of the rule requiring them to protect themselves with blue flags, he gave a record of fatalities among shopmen from October 1, 1925, to February 15, 1926. In each of the eight fatilities reported by him the cause of the death was said to be the *absence of blue flag protection.*) I do not know whether there has been any more killed since this date or not, but will add *if the men had been protecting themselves as outlined in Rule 158, in current agreement,* * * * the casualties probably would have been avoided. *I trust that each officer and member will endeavor to see that this rule is carried out in the future.*"

The man who signed this impressive warning was W. W. Dyke, general chairman of carmen, *who signed the agreement of March 1, 1926, on behalf of the craft of which he was the head.* The letter contains as vivid an interpretation of Paragraph 158, to the effect that *the personal duty was imposed upon the workmen,* as could well be conceived. This evidence was excluded by the trial Judge based largely upon what I consider an erroneous construction of Paragraph 158, contained in the former opinion in this case.

The quotation above set forth from the former opinion is apposite to the present issue: "It is a familiar canon of construction * * * that if a contract is doubtful in meaning, the Court may look into the construction which the parties themselves have placed on it, to reach the true intention, which is the object of all judicial interpretation."

It is also clear from the evidence that Cato himself was familiar with this construction of the paragraph and recognized the fact that it was his personal duty to protect himself with the flags; he was present at meetings of his lodge when the matter was discussed; he had been shown the warning circular letter of Dyke; and he had actually instructed new men in the imperative necessity under the rules to place the flags when about to repair cars. Every man connected with the repair work, put upon the stand, testified to a recognition of this duty. If there is anything in habit, custom, practice, instruction, and construction of the rules, there cannot be a doubt but that Rule 26 was not, and was not intended to be, affected by the indefinite terms of Paragraph 158.

III. It is declared in the opinion of the Chief Justice that there is no doubt but that the intestate, at the time of his death, was engaged in intrastate commerce, and that therefore the Federal Employers' Liability Act had no application to the case. I think that this conclusion is erroneous for two reasons: 1. It appears to be based upon the presumption that the intestate was engaged in intrastate commerce, and that the defendants had failed to overcome this *prima facie*

presumption; 2. It loses sight of the fact that even if the baggage car had been withdrawn from interstate commerce, it was one of a connected string of cars, some of which were unquestionably engaged in interstate commerce, the movement of which was dependent upon the correction of an impairment in the baggage car.

The position as to the presumption referred to is met and overthrown by the case of *Phila. & Reading Ry. Co. v. Polk,* 256 U. S., 332, 41 S. Ct., 518, 519, 65 L. Ed., 958. In that case the question at issue was whether the plaintiff's intestate was engaged in interstate commerce at the time of his death. He was employed as a brakeman upon a "draft" (string) of freight cars being handled by an engine in the yard of the company, and was crushed between two cars; some of the cars were interstate and others intrastate. The Court said: "The referee did not find definitely as a fact that Polk was engaged in intrastate commerce at the time of his injury, but assumed that the fact might be so; therefore, regarded it as so, because in his opinion the burden of proving the contrary; that is, that Polk 'was actually engaged in work incident to interstate commerce,' was upon the company and the company had 'not met the burden required of it' and further, that the company 'offered no testimony whatever to show what work John M. Polk was performing at the time he was injured. * * *' * * * Besides, we cannot accede to the view that there is a presumption that duties performed on a train constituted of interstate and intrastate commerce were performed in the latter commerce. The presumption, indeed, might be the other way. It is to be remembered that it is the declaration of the cases that if there is an element of interstate commerce in a traffic or employment it determines the remedy of the employee. * * * It would seem indisputable, therefore, if there be an assertion of the claim or remedy growing out of an occurrence in which there are constituents of interstate commerce the burden of explanation and avoidance is on him who asserts the claim

or remedy, not on the railway company to which it is directed, and there is nothing in *Osborne v. Gray,* 241 U. S., 16, 36 S. Ct., 486, 60 L. Ed., 865, in opposition."

Upon the second position taken, the undisputed facts are that the baggage car was at the west end of the string of 52 cars on track No. 10, which was not a repair, but a switch track; this string of connected cars consisted of bad order cars which had come in from other states, bound for Hayne shops, a mile and a half from the Hayne yard, the baggage car and some 35 or 40 cars awaiting being made up into trains bound for points outside of the State, all in good order; the cars on track 10 had to be moved out of the west end, which of course could not be accomplished until the disabled baggage car, blocking the way, had been sufficiently repaired to be coupled up to the string of cars and moved to the shops. I think that there can be no doubt but that the bad order cars in the string which had been brought from outside the State, destined to the shops for repair, were engaged in interstate commerce until they reached the shops; or that the good order cars which had been brought from outside the State, and were to be made up into trains bound for points beyond the State, were engaged in interstate commerce. The string of cars was therefore composed of both classes of interstate cars, and the baggage car which, it may be assumed, was an intrastate car. The point is that the baggage car was a part of a train composed of it, other intrastate, and interstate cars; the temporary repair of it, necessary to move the interstate cars, was work upon an integral element of a train composed in part of interstate cars, and necessarily the persons so engaged were employed in interstate commerce.

In *Philadelphia, etc., v. Di Donato,* 256 U. S., 327, 41 S. Ct., 516, 65 L. Ed., 955, it was held, quoting syllabus: "A watchman employed on an interstate railroad at a public grade crossing to signal both interstate and intrastate trains and guard the tracks against disorder and obstruction,

is employed in interstate commerce, irrespective of the interstate or intrastate character of the particular train he may be flagging when injured."

In *New York, etc., R. Co. v. Carr*, 238 U. S., 35 S. Ct., 780, 781, 59 L. Ed., 1298, the plaintiff was injured as a result of the negligence of a fellow servant under the circumstances to be detailed. Under the New York law, the defense of fellow servant would prevail; under the Federal Employers' Liability Act, it would not. (The contentions of the parties were the reverse of the contentions in the case at bar.) The plaintiff was a brakeman on a freight train running between two points in the State of New York; some of the cars in the train contained interstate freight; two of them were engaged in purely intrastate business; they were at the head of the train next to the engine, and were to be left at an intermediate point on the line; on arriving at that point, the two intrastate cars were disconnected from the cars behind them, and, still coupled to the engine, were pulled by it down the track and backed into a side track; it was the duty of another brakeman to uncouple the air hose from the engine, and of the plaintiff to set the hand brakes to prevent the two intrastate cars from rolling down on the main track; the other brakeman suddenly and negligently "broke" the air hose, the result being that the sudden escape of air, applied only in cases of emergency, violently turned the wheel handle attached to the brake which the plaintiff at the time was attempting to set; the wrench threw the plaintiff to the ground and injured him.

The railroad company insisted that, when the two cars were cut out of the train and backed into a siding, they lost their interstate character, so that the plaintiff, while working thereon, was engaged in intrastate commerce, and was not entitled to recover under the Federal Employers' Liability Act. The Court did not sustain the contention, holding: "The plaintiff was a brakeman on an interstate train. As such, it was a part of his duty to assist in the switching,

backing, and uncoupling of the two cars so that they might be left on a siding in order that the interstate train might proceed on its journey. In performing this duty it was necessary to set the brake of the car still attached to the interstate engine, so that, when uncoupled, the latter might return to the interstate train and proceed with it, with Carr and the other interstate employees, on its interstate journey. * * * Under these principles the plaintiff is to be treated as having been employed in interstate commerce at the time of his injury, and the judgment in his favor must be affirmed."

In *L. & N. R. Co. v. Parker*, 242 U. S., 13, 37 S. Ct., 4, 5, 61 L. Ed., 119, the intestate was a fireman upon a switch engine moving upon a switch track, transferring an empty car from one switch track to another; a caboose stood upon the main line so near to where the engine moved that the intestate struck it and was killed. The Court held: "The business upon which the deceased was engaged at the moment was transferring an empty car from one switch track to another. This car was not moving in interstate commerce, and that fact was treated as conclusive by the Court of appeals. In this the Court was in error, for if, as there was strong evidence to show, and as the Court seemed to assume, this movement was simply for the purpose of reaching and moving an interstate car, the purpose would control and the business would be interstate."

In *Erie R. Co. v. Welsh*, 242 U. S., 303, 37 S. Ct., 116, 118, 61 L. Ed., 319, the Court said: "The question remains whether he was performing an act so directly and immediately connected with his previous act of placing the interstate car in the 'F. D. Yard' as to be a part of it or a necessary incident thereto. *New York Central & Hudson River R. R. Co. v. Carr*, 238 U. S., 260, 264, 35 S. Ct., 780, 59 L. Ed., 1298, 1300; *Shanks v. Delaware, Lackawanna & Western R. R. Co.*, 239 U. S., 556, 559, 36 S. Ct., 188, 60 L. Ed., 436, 438, L. R. A., 1916-C, 797. And this depends upon whether the series of acts that he had last performed

was properly to be regarded as a succession of separate tasks or as a single and indivisible task."

In *Southern R. Co. v. Puckett,* 244 U. S., 571, 37 S. Ct., 703, 705, 61 L. Ed., 1321, Ann. Cas., 1918-B, 69, a collision occurred in the yard between two cars; several tracks were blocked by the wreckage; the plaintiff was directed to get a "jack" to assist in raising the wrecked car to extricate an employee who had been caught in the wreck and to clear the track of the wreckage; some of the cars which had not been placed in the train which was being made up were to have been hauled over the tracks obstructed by the wreck, destined from Atlanta to Birmingham; while the plaintiff, assisting in clearing the wreck, was carrying some blocks on his shoulder to be used in jacking up the wrecked car and replacing it upon the track, he stumbled over some clinkers and was injured. The Court said: "The Court [State Court (16 Ga. App., 551, 85 S. E., 809)] held that although plaintiff's primary object may have been to rescue his fellow employee, his act nevertheless was the first step in clearing the obstruction from the tracks, to the end that the remaining cars for train No. 75 might be hauled over them; that his work facilitated interstate transportation on the railroad, and that consequently he was engaged in interstate commerce when injured. We concur in this view. From the facts found, it is plain that the object of clearing the tracks entered inseparably into the purpose of jacking up the car, and gave to the operation the character of interstate commerce."

No mention is made, either in the United States Court or in the State Court, of the character of the car that had to be jacked up, that is, whether it was then engaged in interstate or intrastate commerce. I take it that the absence of any reference thereto is an indication of the insignificance of the issue; both Courts place the decision upon the ground that the instrumentality of interstate commerce, the railroad track, was obstructed, and that the plaintiff was engaged in an effort to remove the obstruction and leave the track open for the

movement of interstate cars delayed by the wreckage. There cannot, I think, be suggested any difference between the obstruction of a track being made ready for interstate transportation by the wreckage of a car and the obstruction by the entire bulk of a car immovable by reason of an impairment in its equipment.

In *Ill. Cent. R. Co. v. Behrens,* 233 U. S., 473, 34 S. Ct., 646, 647, 58 L. Ed., 1051, Ann. Cas., 1914-C, 163, the Court said: " * * * We entertain no doubt that the liability of the carrier for injuries suffered by a member of the crew in the course of its general work was subject to regulation by Congress, whether the particular service being performed at the time of the injury, isolatedly considered, was in interstate or intrastate commerce."

Applicable to the interstate cars in the string of cars on track 10, some of which were destined to the shops for repairs and others to be pulled out of track 10 by the west end and made up into trains, the following extract from the case of *St. L., S. F., & T. R. Co. v. Seale,* 229 U. S., 156, 33 S. Ct., 651, 653, 57 L. Ed., 1129, Ann. Cas., 1914-C, 156, appears pertinent: "In our opinion the evidence does not admit of any other view than that the case made by it was within the Federal Statute. The train from Oklahoma was not only an interstate train, but was engaged in the movement of interstate freight; and the duty which the deceased was performing was connected with that movement, not indirectly or remotely, but directly and immediately. The interstate transportation was not ended merely because that yard was a terminal for that train, nor even if the cars were not going to points beyond. Whether they were going further or were to stop at that station, it still was necessary that the train be broken up and the cars taken to the appropriate tracks for making up outgoing trains, or for unloading or delivering freight, and this was as much a part of the interstate transportation as was the movement across the State line."

In *Texas & P. R. Co. v. White* (Tex. Civ. App.), 177 S. W., 1185, 1186, it was held that a section foreman, engaged in removing a hand car from the track to clear it for a freight train made up of interstate and intrastate cars, was engaged in interstate commerce. The Court said: "We are of the opinion, further, that the act of removing the hand car from the track out of the way of the coming train, being in the aid of the movement of interstate traffic, was sufficient of itself to bring the accident within the operation of the Federal Employers' Liability Act; in other words, that White, in removing the hand car for the purpose of giving a clear track to the train loaded in part with interstate freight, was engaged in interstate commerce within the meaning of the Act."

Suppose this situation had developed upon the main line instead of upon a switch track, the freight cars obstructing the track by reason of the coupling upon a local car coming out, and the car repairer had been injured while repairing the coupling so that the track could be cleared for an interstate train, could there be any question of the character of the car repairer's employment?

It may be suggested that it was not necessary that the interstate cars in the string of cars on track 10 should be moved out at the west end of the track; that may be true, but it is conceded that the actual movement intended was in that direction. In the *Puckett case, supra,* it appeared that the train for which the track was being cleared actually made a detour on account of the wreckage, and yet it was held that, as the plaintiff had been injured while endeavoring to clear the wreckage for that train, he was engaged in interstate commerce.

In *Bamberger Electric R. Co. v. Winslow* (C. C. A.), 45 F. (2d), 499, 502, a section man who was injured in replacing a local gravel car derailed on a transfer track, to clear the track for waiting interstate cars, was held engaged in interstate commerce. The Court said: "Rerailing the gravel

car enabled the construction work to proceed. It also cleared the old transfer track for use in interstate commerce. Since Winslow was employed in replacing a derailed gravel car on the transfer track, in order to clear the track for interstate commerce, he was engaged in interstate commerce at the time of the injury."

In *L. & N. R. Co. v. Jolly,* 232 Ky., 702, 23 S. W. (2d), 564, it was held, quoting syllabus: "Act of employee expediting, furthering, or facilitating movement in interstate commerce, or securing its safety, is in 'interstate commerce' " *Certiorari* denied by Supreme Court, 282 U. S., 847, 51 S. Ct., 26, 75 L. Ed., 751.

"Doing work having for immediate purpose furtherance of interstate commerce constitutes employment in 'interstate commerce.' " *Van Dusen v. Department,* 158 Wash., 414, 290 P., 803, 804. See, also, *Penn. Co. v. Donat,* 239 U. S., 50, 36 S. Ct., 4, 60 L. Ed., 139; *Seaboard A. L. v. Koennecke,* 239 U. S., 352, 36 S. Ct., 126, 60 L. Ed., 324; *Southern R. Co. v. Lloyd,* 239 U. S., 496, 36 S. Ct., 210, 60 L. Ed., 402; *Phila. & R. R. Co. v. Hancock,* 253 U. S., 284, 40 S. Ct., 512, 64 L. Ed., 907.

I think it is clear, therefore, that the intestate was engaged in interstate commerce at the time of his injury; that the case is controlled by the declared law applicable to the Federal Employers' Liability Act, and that no recovery was permissible under the first cause of action.

IV. With reference to the first cause of action, I think that the motion of the defendants for a nonsuit, or a directed verdict, should have been granted upon any one or all of the following grounds: (a) That his injury and death were due to his sole negligence as *the* direct and proximate cause thereof; (b) that they were due to his negligence as *a* direct and proximate cause contributing thereto; (c) that they were due to his voluntary and conscious assumption of the risk of working under a car in violation of the obliga-

tion resting upon him, to protect himself by the placing of a blue flag at the eastern end of the string of cars on track 10.

As a matter of course, these suggested grounds need not be considered in the event that it should be concluded that the intestate, at the time of his injury, was engaged in interstate commerce, bringing the case within the law of the Federal Employers' Liability Act.

(a) I have endeavored to show that the holding of the Court upon the former appeal, that the working agreement of 1926 superseded Rule 26, which made it mandatory upon the intestate to place the protecting flag, is erroneous, and that the Court, upon this appeal, has the right to disregard it. If the argument upon these propositions be sound, there can be no escape from the conclusion that the conceded failure of the intestate to respond to this obligation was the sole, direct, and proximate cause of the disaster. The evidence unmistakably shows, according to the testimony of a cloud of witnesses and the acknowledgment of the general chairman who signed the agreement for the intestate and others, that Rule 26 was unaffected by Paragraph 158 of the agreement, and was considered and acted upon by all concerned as still binding; it shows that the intestate knew of this fact; that he had repeatedly been warned against a violation of it and made no complaint that the duty rested upon the company or any other employee.

(b) The duty of protecting himself by the placing of a flag resting upon the intestate, its absence was the inducing cause of the entry upon track 10 by the operators of the engine and cars which caused the movement of the baggage car; no negligence on their part could be charged against them, and there was nothing else upon which a charge of negligence against the company could be urged.

But assume that there was negligence on the part of these operators, there can be no question that the negligence of the intestate in disobeying Rule 26 was a direct, proximate, and contributing cause of the disaster.

(c) The evidence is plenary that the intestate knew of the rule, was constantly and repeatedly warned of the danger, knew of the danger and voluntarily and consciously assumed a risk which was as clearly before his eyes as was the baggage car upon which, and *under which,* he was working.

The defendants proffered a request to charge No. 23 as follows: "While I charge and instruct you that the master must furnish his servant a safe place in which to work by posting a blue flag, nevertheless, the master may delegate this duty to the servant." In response, his Honor stated: "If that means Cato (the intestate), I refuse it." The refusal of this request is made the ground of Exceptions 6 and 23. I can see no reason why the request, appropriate to the facts of the case, should not have been granted. In 39 C. J., 324, it is said: "While a master may not delegate his positive duty to furnish his servant with reasonably safe instrumentalities wherewith and places wherein, to do his work, it is nevertheless competent for the master to impose on, and for the servant to accept, by contract or mutual understanding, the burden of inspection, examination, or even in some cases the maintenance, of the appliances or places he is required to use, such as he is competent to make. Thus the master may trust the servant to perform the intermediate, ordinary, and simple duties, incidental to the servant's employment and resting upon the servant's knowledge and skill, as, for instance, the keeping of simple tools in repair and making light repairs. Likewise, an employer may delegate to the servant the preparation for his own place in which to do his work, and the master may relieve himself of liability by intrusting to his servant the duty of inspection and care in respect of a place he is engaged in making safe or which by contract he is bound to make safe, or the duty of caring for the safety of a place or appliance where the work necessarily changes the character of the place or appliance, and although others participate in such work."

This statement expresses the law in South Carolina, as is shown by the case of *Cline v. Southern Railway Co.,* 101 S. C., 493, 86 S. E., 17, 18 (1915). A bridge foreman was injured while assisting his gang to remove a bent from a trestle. His injury was caused by slipping on a piece of coal. Affirming a judgment for the defendant, the Court said: "The plaintiff went to a place used for hauling coal, and where coal might be expected to lie on the ground. It was his duty to have the place prepared for the work, and if it was necessary to remove the coal in order to make the place safe for the work, it was the plaintiff's fault that the coal was left there."

See, upon the infraction of the blue flag rule, *Pinckney v. R. Co.,* 89 S. C., 525, 72 S. E., 394; *Stephens v. R. Co.,* 82 S. C., 542, 64 S. E., 601; *Mills v. R. Co.,* 85 S. C., 471, 67 S. E., 565; *Stone v. R. Co.,* 96 S. C., 228, 80 S. E., 433; *Owens v. R. Co.,* 141 S. C., 359, 139 S. E., 779.

V. With reference to the second cause of action, under the Federal Employers'.Liability Act, I think that the motion for a nonsuit or a directed verdict should have been granted upon either or both of the grounds indicated above as (a) and (c). The ground (b) involving the defense of contributory negligence cannot, of course,.be urged as a ground for nonsuit or directed verdict in actions under the Federal Employers' Liability Act. The other grounds (a) and (c), are sufficiently elaborated, I think, under Subdivision IV.

VI. I can see no possible objection to request to charge No. 12, which was as follows: "Because the presiding Judge erred in refusing to charge defendants' twelfth request, to this effect: 'I charge and instruct you that if Cato was negligent in not putting up a blue flag to protect the car he was working on, and this negligence was the sole cause of Cato's death, then the plaintiff cannot recover, and your verdict must be for the defendant'; the error being that this is a sound proposition of law, applicable to the facts in this case, and under the evidence should have been so charged."

Under the views I have expressed, if it was the duty of Cato to protect himself with a flag, under Rule 26, the refusal of the request was clearly error; if Cato was not bound by Rule 26, and yet, independently of it, was guilty of negligence in not protecting himself, and that negligence was the sole, proximate cause of his injury, the request was proper. His negligence might have consisted in failing to respond to the obligation deputed to him by the company even if Rule 26 had no application.